BLACK, Circuit Judge:
Appellant William Howard Putman was convicted of two counts of murder and sentenced to death for each count on September 17, 1982, in Cook County, Georgia.' On April 22, 1997, Appellant filed, pursuant to 28 U.S.C. § 2254, a federal petition for a writ of habeas corpus, challenging his Cook County convictions and sentences as constitutionally infirm. The district court denied the petition. See Putman v. Turpin, 53 F.Supp.2d 1285 (M.D.Ga.1999). On September 10, 1999, Appellant filed the instant appeal. We affirm.
I. ISSUES FOR REVIEW
As this appeal was initiated after April 24, 1996, it is governed by the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. See Slack v. McDaniel, 529 U.S. 473, 120 S.Ct. 1595, 1600, 146 L.Ed.2d 542 (2000). As amended by AED-PA, 28 U.S.C. § 2253(c)(1) mandates that a habeas petitioner obtain a certificate of appealability (COA) in order to take an appeal. To gain a COA, a petitioner must make “a substantial showing of a denial of a constitutional right.” 28 U.S.C. § 2253(c)(2). Furthermore, in granting a COA, a court must specify on which issues the petitioner has' made the requisite showing. See 28 U.S.C. § 2253(c)(3); Peoples v. Haley, 227 F.3d 1342, 1345 (11th Cir.2000). Here, the district court granted a COA, but failed to specify the appropriate issues pursuant to § 2253(c)(3).
The district court’s failure to enumerate the issues for appellate review does *1228 not deprive us of jurisdiction. See Haley, 227 F.3d at 1346 (citing Franklin v. Hightower, 215 F.3d 1196, 1199 (11th Cir.2000), cert. denied — U.S. -, 121 S.Ct. 1738, 149 L.Ed.2d 662 (2001)). Rather, in exercising our discretion, we may either remand to the district court with instructions to enumerate the issues, or we may rule which issues raised by the petitioner warrant a COA. See id. In this case, we choose to decide ourselves which issues, if any, are worthy of a COA.
In his brief, Appellant raises the following issues: (1) for both the guilt/innocence and sentencing phases of the trial, whether Appellant’s right to due process was denied by the prosecutor’s alleged failure to disclose exculpatory material;[1] (2) for the guilt/innocence phase of the trial, whether Appellant was denied effective assistance of counsel;[2] and (3) for the sentencing phase of the trial, whether Appellant was denied effective assistance of counsel. After reviewing the record and the well-reasoned opinion of the district court, see Putman, 53 F.Supp.2d at 1298-1301, 1304-10, we conclude that, for the first two issues, Appellant has failed to make a substantial showing of a denial of a constitutional right and is not entitled to a COA.[3] For the third issue, Appellant has *1229 made the necessary substantial showing. We grant a COA on the third issue and address only that issue in this opinion.
II. BACKGROUND
In the early morning hours of July 10, 1980, three murders occurred in the vicinity of Interstate 75 in south central Georgia. One murder occurred in the parking lot of a truck stop in Valdosta, Lowndes County. The other two murders occurred at a rest area near Lenox, Cook County, which lies north of Lowndes County. Eventually, the state of Georgia prosecuted Appellant, a truck driver, for all three murders.
Georgia conducted two separate trials for the three murders — one trial for the single murder in Lowndes County and another trial for the two murders in Cook County. At both trials, the prosecution presented substantial evidence about all three murders. The juries found Appellant guilty of all three murders. But at the first (Lowndes County) trial, the jury sentenced Appellant to life imprisonment, whereas at the second (Cook County) trial, the jury sentenced Appellant to death. The instant petition challenges the Cook County conviction and sentence.
While Appellant had the same lead counsel at both trials, the other members of his legal team changed between proceedings. Appellant’s primary contention — -and the only one for which we have granted a COA — is that his Cook County legal team rendered ineffective assistance of counsel during the sentencing phase. In a nutshell, Appellant argues the failure of his Cook County lawyers to adhere to the sentencing strategy of his Lowndes County lawyers constituted deficient legal assistance, and but for this deficiency, there is a reasonable probability Appellant would not have been sentenced to death.
To fully explore Appellant’s contention, we must detail the facts underlying all three murders and the facts related to Appellant’s legal representation at both trials' — even though, to reiterate, the instant petition challenges only the Cook County judgment. Thus, in this part of the opinion, we first set forth the facts surrounding the three murders. Then, we explain the procedural history of the instant petition. Lastly, we factually compare the Lowndes County sentencing phase and the Cook County sentencing phase, focusing on the representation Appellant received at each proceeding.
*1230 A. Factual Background of Appellant’s Convictions
The facts underlying Appellant’s convictions are thoroughly set forth in the Supreme Court of Georgia’s opinion denying Appellant’s direct appeal. See Putman v. State, 251 Ga. 605, 308 S.E.2d 145, 147-48 (1983), quoted in Putman, 53 F.Supp.2d at 1290-92. We repeat those facts here:
In the early morning hours of July 10, 1980, David Hardin and his wife Katie [Christine Back], residents of Kentucky, were shot to death at an Interstate 75 rest area near Lenox, Georgia. Truck driver [and Appellant] William Howard Putman was arrested and charged with two counts of murder....
The victims spent the week preceding their deaths vacationing in Daytona Beach with their three children and David’s niece Beverly Culver. They left Daytona Beach in their blue Dodge sedan on the evening of July 9 and arrived at the Lenox rest area some time prior to 3:00 a.m. on the tenth. They parked in the automobile parking lot of the rest area and went to sleep.
Later arrivals at the rest area included Verlin Colter, who parked two spaces to the right of the Hardins, and Dessie Harris, who parked across the drive-through, opposite the Hardin, automobile.
Dessie testified that, upon her arrival, she spread a blanket on the hood of her car. As she sat on the blanket, smoking a cigarette, she observed a dark-colored “semi,” pulling a flat-bed trailer, drive slowly several times through the automobile parking lot. The truck eventually parked at the end of the parking lot. The driver got out, reached into the cab of the truck, retrieved an object and walked toward her car. He stopped under a nearby tree, approximately five feet from Dessie, and whistled at her. She stared at him but said nothing. The man then walked behind her car and proceeded across the parking lot. He went around to the front of the Hardin automobile and stood there for a few moments.
In the meantime, Verlin Colter arrived and parked. He observed that a dark-colored semi with an empty, yellow flat-bed trailer was parked at the end of the automobile parking lot and that a man was standing in front of the blue Dodge, whose occupants were all apparently asleep.
Dessie testified that the man walked around to the driver’s side of the Hardin automobile. She heard a loud noise and then the man ran to the passenger side of the car.
Verlin testified that, just as he lay down in his automobile, he heard a loud noise that sounded like a firecracker. He looked up and saw a woman in the front passenger seat of the Dodge opening the passenger door. The man he had seen earlier ran around the car to her door.
Beverly Culver, who had been asleep in the back seat of the Dodge with Katie’s two older children, testified that she was awakened by a loud noise. She saw a man standing outside the car, next to David Hardin, who lay in the driver’s seat with his head resting on the back of the seat, next to the door. The man hurried to the passenger side of the car.
Beverly, Verlin and Dessie all observed what happened next: As Katie Hardin tried to get out of the car, the man grabbed her and demanded that she go with him. She refused, and screamed for David, who lay fatally wounded in the driver’s seat. The man shot Katie in the head. He then reached into the car and placed something into the waist-band of his pants. *1231 He ran to his truck and drove off, headed north.
Verlin called the police, who arrived at the rest area just before 5:30 a.m. Based on information obtained from the witnesses, a lookout was posted for a white male, proceeding north on Interstate 75, driving a dark-blue or black truck pulling an empty, yellow flat-bed trailer.
A truck fitting this description was spotted by police just south of Cordele and followed to a rest area in Dooly County. The truck parked in the exit lane of the rest area and the driver went to the restroom. Backup units arrived and the driver, [Appellant], was arrested after he returned to his truck. Officers smelled alcohol on [Appellant’s] breath and he was initially taken to the Dooly County Sheriffs Office for an intoxime-ter test, which indicated that [Appellant’s] blood alcohol level was .13 grams/percent. [Appellant] had what appeared to be blood on his left pants leg.
Officers recovered a .38 caliber revolver from under the driver’s seat of [Appellant’s] truck. The revolver had three live rounds and two spent cartridges in its chamber. A gun case and David Hardin’s wallet lay on the passenger seat.
[Appellant] was returned to Cook County at approximately 7:30 a.m. Des-sie Harris was at the courthouse, having just given a statement to investigators. As she stood outside smoking a cigarette, [Appellant] arrived in a police car. She immediately recognized him as the man who had shot David and Katie Hardin.
At approximately 2:30 p.m. of the same day, the body of William Gerald Hodges was found slumped over the wheel of his automobile in the parking lot of a truck stop in Valdosta. He had been shot in the head and shoulder. The pathologist who conducted the autopsy testified that a time of death could not be established with any certainty. However, lividity patterns indicated that death had occurred some time prior to Hodges’ arrival at the morgue at 3:10 p.m. A .38 caliber bullet was recovered from the interior of his automobile and another was recovered from inside his skull.
After [Appellant’s] arrival in Cook County, his clothing was removed from him and the contents of his pockets were inventoried. In his shirt pockets were two. 38 caliber cartridges and an insurance card bearing the name William G. Hodges. In the pockets of his trousers were a gold Timex wristwateh and two gold rings, one having a red stone and the other a blue stone. The rings and the watch were identified by friends as having belonged to William Hodges. Serological examination of the reddish-brown substance on the leg of [Appellant’s] trousers and on the blue-stone ring established that the substance was blood having characteristics consistent with the blood of William Hodges and inconsistent with the blood of 98.3 percent of the general population.
A fresh dent was discovered on the right rear corner of the roof of Hodges’ automobile. The dent was horizontal, two or three inches long. Yellow paint was present in the grooves of the dent, and loose flakes of yellow paint surrounded the dent. The yellow paint was the same color as the trailer of [Appellant’s] truck.
The .38 caliber revolver found in [Appellant’s] truck was purchased by him at a Talledega, Alabama, pawn shop on May 9, 1980. Ballistics examination showed that the bullet removed from the skull of David Hardin, the bullet removed from the skull of Katie Hardin, the bullet removed from the skull of William Hodges and the bullet removed *1232 from the interior of Hodges’ automobile had all been fired from the same gun: [Appellant’s] .38 caliber revolver.
[Appellant] testified that he was returning from Florida on the 9th and 10th of July. He admitted that he stopped at the truck stop in Valdosta at approximately 10:00 p.m. on the 9th. He said he had two beers and three mixed drinks, and then went to sleep in his truck. When he left a couple of hours later, he took with him a hitchhiker known to him only as “Jeff.” He stopped briefly at the first rest area north of Valdosta on Interstate 75, near Hahira, to wash his hands, and subsequently let Jeff out at an exit near Adel. He then proceeded directly to the rest area in Dooly County where he was arrested. [Appellant] denied having stopped at the Lenox rest area. He admitted owning the .38 revolver found in his truck, but denied having shot anyone with it.
Putman, 308 S.E.2d at 147-48.
B. Procedural Background
As previously mentioned, the state of Georgia prosecuted Appellant in two separate trials for the offenses described above. In May 1981, Appellant was tried in Lowndes County and convicted of the murder of William Hodges. The jury sentenced Appellant to life imprisonment. The conviction and sentence were affirmed on direct appeal. See Putnam [sic] v. State, 250 Ga. 418, 297 S.E.2d 286 (1982). We are not aware of any collateral attacks by Appellant against the Lowndes County judgment.
In September 1982, Appellant was tried in Cook County and convicted of the murders of David Hardin and Katie Christine Back. The jury sentenced Appellant to two death sentences, one for each murder. The instant habeas petition challenges the Cook County convictions and sentences, which were affirmed on direct appeal. See Putman, 308 S.E.2d at 145.
Appellant’s first collateral attack on the Cook County judgment was a petition for writ of habeas corpus and a motion for stay of execution filed in state court. The state habeas court found that Appellant’s petition lacked merit and denied Appellant’s motion for a stay of execution. Appellant then filed a habeas petition and a motion for stay of execution in federal district court. The district court granted a stay of execution, but subsequently Appellant voluntarily dismissed the federal petition.
Shortly after the stay of execution, Appellant amended his state petition to assert a claim of ineffective assistance of trial counsel. Appellant also filed in state court alternative motions for a new trial and to set aside judgment in order to reopen the evidence in the state habeas corpus case. The state habeas court denied these motions. Appellant applied to the Supreme Court of Georgia for a certificate of probable cause. The court granted the application and remanded for an evidentiary hearing on the issue of trial counsel’s alleged ineffectiveness.
On August 27, 1985, the state habeas court held an evidentiary hearing. In a written order dated April 4, 1989, the court set forth its findings of fact and conclusions of law, determining there was no merit to the ineffective assistance claim or any other issue raised by Appellant. On July 12, 1989, the Supreme Court of Georgia, with two justices dissenting, denied without opinion Appellant’s application for a certificate of probable cause. The United States Supreme Court denied certiorari. See Putman v. Zant, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).[4]
*1233 On April 23, 1997, Appellant filed the instant federal petition, seeking habeas relief pursuant to 28 U.S.C. § 2254. The district court denied the petition. Appellant filed this appeal.
C. Factual Background of Sentencing Phases and Legal Representations
Our narration of the facts relating to the sentencing phases, focusing on Appellant’s legal representations, is drawn from the record before the state habeas court when it considered Appellant’s habeas petition and his claims of ineffective assistance.[5] First, we summarize the legal experience of Appellant’s two legal teams. Second, we consider the evidence presented and arguments at the two sentencing phases, and we mention alleged potential witnesses who were not called to testify. Third, we explain differences in the jury instructions. Lastly, we examine the defense strategy of Appellant’s Cook County team.
1. Experience of Appellant’s Attorneys
a. Loumdes County
For the Lowndes County trial, Appellant’s family privately obtained the services of attorney Elsie Griner, Sr. At the time of trial, Ms. Griner had over 60 years of trial experience and had tried countless criminal cases, including one death penalty case in which her client had received a life sentence. Ms. Griner served as lead counsel and was present at all hearings and at trial. The other defense counsel at the Lowndes County trial were Marcus Davis and Michael Bennett. Mr. Davis at the time of the trial had been an attorney for approximately five years. Mr. Bennett, who practiced in Lowndes County, had been an attorney for approximately four years and had never tried a death penalty case. In addition, Galen P. Alderman, a law student and the granddaughter of Ms. Griner, assisted Appellant’s defense team.
b. Cook County
For the Cook County trial, Mr. Bennett was never a member of Appellant’s defense team. Mr. Davis was initially on Appellant’s Cook County team, but he withdrew early in the case and had little involvement. Ms. Griner again served as Appellant’s lead counsel. In addition to Ms. Griner, Appellant was represented by Ms. Alderman and Daniel Studstill. Additionally, Ms. Griner’s daughter (Elsie Gri-ner, Jr.), was a lay investigator who assisted Appellant’s Cook County team and conducted “[hjundreds of hours of investigation.”
Ms. Alderman, a law student at the time of the Lowndes County trial, had since graduated and had been a member of the bar for just under a year at the time of the Cook County trial. Appellant’s case was Ms. Alderman’s first criminal trial as a lawyer.
*1234 Mr. Studstill was the Public Defender for the Alapaha Judicial Circuit, consisting of five counties. Mr. Studstill had practiced law since 1980. He had tried numerous criminal cases. Appellant’s case was his first death penalty case as a defense attorney. Prior to being a lawyer, however, Mr. Studstill had worked for two years as an investigator in the district attorney’s office and had been involved in the prosecution of four death penalty cases. On the eve of the Cook County trial, Mr. Studs-till’s father passed away. The state court refused to grant a continuance. As a result, Mr. Studstill was absent for most of the guilt/innocence phase, but he was present for the sentencing phase.
2. Evidence Presented and Closing Arguments
a. Lowndes County
During the sentencing phase of the Lowndes County trial, Mr. Davis handled the examination of the witnesses. Nine witnesses were called to present evidence of mitigation. The witnesses were as follows: five relatives (wife, father, sister, sister-in-law, and step-sister’s husband), a co-worker, Ms. Griner, a deputy from the prison where Appellant was detained, and Appellant himself.[6] Nearly all the witnesses testified Appellant would not pose a danger to others in prison and that keeping Appellant alive would be beneficial to society.
The relatives all gave the same general testimony. That is, Appellant was a man of good character and peaceful nature; he possessed a strong love for his family; and he was a good father, husband, and friend. The relatives recounted particular incidences when Appellant had been especially kind or helpful. On cross-examination, however, the relatives conceded they had not observed Appellant’s character while he was traveling in his truck.
According to the co-worker, Appellant showed concern, took time to help, and was peaceful away from home. But on cross-examination, the co-worker conceded that he had not observed Appellant traveling in his truck, that he did not know Appellant took drugs to stay awake while traveling, and that he was unaware Appellant drank alcohol and occasionally mixed his anti-sleeping drugs with alcohol.
Ms. Griner testified Appellant was unusual compared to her other clients, who were often violent, and she was impressed by Appellant’s non-violent manner, fairness, and concern for others. The prison deputy attested that Appellant had been a trouble-free prisoner, relating how Appellant advised visiting schoolchildren to stay out of prison.
In his own testimony, Appellant also informed the jury that he gave advice to visiting schoolchildren. In addition, Appellant communicated his family life, his employment history, his lack of any prior convictions, and a myriad of personal details. For instance, Appellant talked about his tending to a sick sibling; his love for his family; his religious courses in prison; and his belief in God.
Turning to the closing arguments, the prosecutor did not accuse Appellant of being friendless. Rather, the prosecutor explained the different theories of punishment: rehabilitation, deterrence, and retribution. The prosecutor contended that Appellant was not worthy of rehabilitation, and that deterrence and retribution called for the death penalty.
Mr. Bennett conducted the closing argument on behalf of Appellant. He appealed to the jurors to consider the testimony of Appellant’s relatives. In particular, he argued the crime for which Appellant was convicted was completely contrary to the *1235 reputation Appellant had established during the first 38 years of his life. Additionally, Mr. Bennett made a “lingering doubt” argument, raising the possibility that scientific evidence might someday establish Appehant to be innocent.
b. Cook County
At the Cook County trial, four witnesses were cahed during the sentencing phase. Ms. Alderman examined three witnesses: Appellant’s sister (who also testified in Lowndes County), Appellant’s niece, and an agent from the Georgia Bureau of Investigation (GBI). Ms. Griner examined Appellant.
Although quantitatively less, the testimonies of the sister and niece were qualitatively similar to the testimonies given by the five relatives at the Lowndes County trial. As set forth in more detail in the margin, the sister and niece gave an impression of Appellant as a good family man and friend who was hard-working, honest, loving, and non-violent.[7] Both the sister and niece stated it would ■ be a loss if Appellant were executed.
The GBI agent did not personally know Appellant. Rather, based on his file, he narrated Appellant’s employment history. This history showed that, for the most part, Appellant had been consistently employed. Additionally, the GBI agent was unable to find any derogatory information about Appellant’s employment.
Appellant’s testimony was similar to his testimony at the Lowndes County trial. During the guilt/innocence phase, Appellant informed the jury about his family, including his three children. At the sentencing phase, Appellant told the jury he had never been in trouble and had always been a hard worker. Additionally, Appellant maintained his innocence.
Turning to closing arguments, the Cook County prosecutor made an argument not made by the Lowndes County prosecutor. Specifically, he argued:
More important than what you heard this afternoon is what you did not hear. *1236 You did not hear a preacher. You did not hear a gideon. You did not hear one single co-worker. You did not hear one single personal friend who knows him and knows what he’s like. His wife knows him. His personal friends, if he has any, would know. But, you didn’t have it and it wasn’t there and it’s not there.... [Appellant is] the kind of man who doesn’t have a preacher to come and speak up for him; a personal friend; a close, close family member. So, I say to you that tells you more than anything else you’ve heard in three days about this man.
The foregoing argument to the jury did not go unrebutted. In her closing argument, Ms. Alderman explained that Appellant’s friends lived far away, and Appellant could not afford to pay their travel expenses. She stressed that Appellant’s family stood by him, and she pleaded for mercy. Additionally, she emphasized to the jury the seriousness of their deliberations — if they chose the death penalty, Appellant would die by electrocution. Finally, like Mr. Bennett in Lowndes County, Ms. Alderman made a “lingering doubt” argument, raising the possibility that one day Appellant’s claim of innocence might be proven true.
c. Witnesses Not Called at Cook County Trial
Not surprisingly, Appellant points to persons who were not called to testify at the Cook County trial. Unlike in Lowndes County, neither a co-worker, a prison official, nor a lawyer testified for Appellant in Cook County. In the state habeas proceeding, Appellant presented affidavits of numerous people who swore they would have testified in Cook County, if asked, and would have attested to Appellant’s peaceful character. Many also opined they did not believe Appellant was capable of committing murder.
The affiants were mostly family, friends, and co-workers.[8] The affiants, however, did not include the co-worker and prison official who testified for Appellant in Lowndes County. Some affiants were relatives who had testified at the Lowndes County trial, such as Appellant’s ex-wife. ■ (Appellant divorced between the Lowndes County trial and the Cook County trial.) Although Appellant’s ex-wife was present at the Cook County trial, Appellant’s lawyers decided not to call her for reasons discussed below. See infra Part II.C.4. Another affiant was a co-worker who attested that he was present at the Cook County trial, but was never asked to testify-
3. Jury Instructions
Although the evidence at the Lowndes County and Cook County sentencing phases was similar, the jury instructions had critical distinctions, as a result of different strategies pursued by the two prosecutors. The Lowndes County prosecutor presented only two aggravating circumstances to the jury: (1) Appellant committed murder in the course of another capital felony, to wit, the armed robbery of William Hodges, and (2) Appellant committed armed robbery for the purpose of receiving money or other things of monetary value, to wit, Hodges’ two gold-colored rings and watch. Unless one of the these two aggravating circumstances was shown by proof beyond a reasonable doubt, the jury was instructed that it could not impose death under Georgia law. Of course, the jury ultimate *1237 ly did not impose death. Notably, the Lowndes County prosecutor did not argue — and the trial court did not instruct— that the jury should consider the murders of David Hardin and Katie Christine Back as aggravating circumstances.
In Cook County, the jury was also told that it could impose death if it found, beyond a reasonable doubt, the aggravating circumstance, to wit, murder during the commission of another capital felony. But the capital felonies alleged in Cook County were far more serious. The Cook County jury instructions pointed to three capital felonies for each murder count. For both the Hardin and Back murder counts, the murder of Hodges and the armed robbery of Hardin constituted two of the capital felonies. The third capital felony for the Back murder count was the Hardin murder, while the third capital felony for the Hardin murder count was the Back murder.[9] Simply stated, unlike their Lowndes County counterparts, the Cook County jurors were permitted to consider events in Cook County, including the egregious murders of Hardin and Back, when deciding whether to impose the death penalty.
In his closing argument, the Cook County prosecutor took advantage of this more favorable jury instruction by emphasizing that Appellant had committed three murders. The Cook County prosecutor highlighted the particular, and more egregious, facts of the Hardin and Back murders— facts which the Lowndes County prosecutor did not, and could not, mention in his closing argument. For instance, the Cook County prosecutor stated:
I want to point out that ... [Appellant] executed the mother of three children in part of their presence. I want to point out to you ladies and gentlemen of the jury, that Katie Christine Back’s death could have been worse. I ask you to recall the circumstances in which he attempted to force her from the automobile, force her to leave with him, tried to drag her out of the vehicle, she refused, she fought, she screamed, she was shot and killed.
In imposing two death penalties, the Cook County jury relied on three aggravating circumstances: the Hardin murder, the Back murder, and the Hardin armed robbery.[10] Interestingly, the Cook County jury did not find the Hodges murder in Lowndes County to be an aggravating circumstance.
4. Cook County Defense Strategy
Initially, the division of labor amongst Appellant’s Cook County attorneys was to be as follows: Ms. Griner and Ms. Alder *1238 man would handle the investigative work and the guilt/innocence phase; Mr. Studs-till would handle motions and voire dire; and all three attorneys would handle the sentencing phase. When Mr. Studstill was unable to attend the beginning of the trial due to his father’s death, Ms. Griner conducted voire dire.
All three Cook County attorneys were fully aware of the defense presented at the Lowndes County trial. The Cook County court held a pre-trial hearing in Lowndes County for the sole purpose of giving Appellant’s attorneys the opportunity to review the Lowndes County record. Furthermore, Ms. Griner, as lead counsel, had been present for the entire Lowndes County trial, and along with her investigator, examined the Lowndes County record. Ms. Alderman, who assisted at the Lowndes County trial, had access to the Lowndes County transcript. Mr. Studstill, although not involved with the Lowndes County trial, personally reviewed the entire Lowndes County transcript.
Although all three attorneys were to share responsibility for the sentencing phase, it became evident at the 1985 habe-as hearing that Ms. Griner did the majority of the preparation.[11] Ms. Griner’s primary strategy was to prove Appellant’s innocence (and thus avoid sentencing). She pursued this strategy by lodging objections throughout the trial and by placing Appellant on the stand to explain his version of events.
Nonetheless, Ms. Griner did spend time preparing for the sentencing phase in the event Appellant was found guilty. She interviewed Appellant “hundreds of times and talked to Appellant’s family members.” In particular, Ms. Griner considered calling as witnesses Appellant’s daughter, ex-wife, sister, and niece, as well as the GBI agent. Ms. Griner decided against calling the daughter because “she was too angry.” Likewise, Ms. Griner decided not to call Appellant’s ex-wife because she was “too upset” to testify.
Additionally, Ms. Griner spoke with Appellant “a lot” and “specifically” about which persons would be called as witnesses for the sentencing phase, and Appellant suggested a number of persons to call as witnesses, including some co-workers from Alabama. Ms. Griner was unable to locate one co-worker, who had driven with Appellant, because he had left town. Ms. Griner also contacted one of Appellant’s neighbors, who attended the Lowndes County trial. Ms. Griner planned to call the neighbor as a character witness, but at trial, she learned the neighbor would not be able to miss work to attend the Cook County proceeding. Lastly, Ms. Griner talked to other potential witnesses at the trial (though she could not remember precisely who), but because they got upset about the guilty verdict, they could not testify.
By contrast, Mr. Studstill did not prepare any witnesses for the sentencing phase. Mr. Studstill neither subpoenaed any witnesses (other than those already subpoenaed by the prosecution) nor interviewed any witnesses. This is not surprising. Of Appellant’s three attorneys, Mr. Studstill was the least familiar with the facts of the case, since he had not been involved with the Lowndes County trial. As such, Mr. Studstill’s contributions primarily involved legal, rather than factual, matters.
Based on his experience in Cook County and the evidence against Appellant, Mr. *1239 Studstill believed Appellant was likely to be convicted and to receive the death penalty.[12] As he testified at the 1985 eviden-tiary hearing, “[I]n Cook County, I think they’re real pro death penalty[,] and I don’t believe ... that we could have put up anybody at the mitigation sentencing phase that would have changed the jury’s mind.” Rather than focusing on sentencing, Mr. Studstill concentrated his efforts on creating legal error in the trial. The following exchange between Appellant’s state habeas counsel and Mr. Studstill at the 1985 hearing accurately summarizes Mr. Studstill’s strategic thinking at the time of trial (in contrast to habeas counsel’s strategic thinking after trial):
[Habeas Counsel]: Nobody was called other than the two witnesses who happened to be in the courtroom that day.
[Mr. Studstill]: Yes.
[Habeas Counsel]: Is that fact — correct? Does that about sum up how the decisions were made?
[Mr. Studstill]: Well, no, you’ve implied that we were flying by the seat of our pants. And that’s not exactly the way things were happening.
If we could back up a little bit, I felt like [the death penalty] was inevitable. So I thought my major role was to lay ... the judge traps and to perfect the record on appeal. And that was basically what I was going to do with voire dire. That was what I was going to try to do during my portion of the guili/innocence whether it be through cross examination or whether it be through the raising of evidentiary motions or whatever. Okay?
Not being really familiar in detail with every fact of the case, some of these people [mentioned as possible mitigation witnesses] ... mean nothing to me. Because, as I said, I prepared mostly for the legal issues of the judge traps and trying to get it turned on appeal and then having the State accept life sentence if we got it reversed on appeal.
Prior to trial, one “judge trap” Mr. Studstill tried to set was a motion for sequestration of jurors during voir dire. Mr. Studstill hoped to show that the trial judge, in violation of Appellant’s due process right, always denied requests to sequester jurors during voire dire. Mr. Studstill filed many other pre-trial motions, including a motion to suppress, a motion for additional peremptory challenges, and a motion to exclude all references to the Hodges murder.
During the sentencing phase, Mr. Studs-till made several additional legal objections. For instance, with respect to the jury instructions, Mr. Studstill cited Georgia case law for the proposition that the Hodges murder was completed prior to the Hardin and Back murders, and therefore the jury could not consider the Hodges murder as an aggravating circumstance. Again citing Georgia case law, he further argued that, since Appellant had not been charged with the armed robbery of Hardin, the jury could not consider armed robbery as an aggravating circumstance. Mr. Studstill also contended that the jury should not be permitted during their deliberations to view certain photographs which, in his view, would inflame the jury’s passion.
Finally, Mr. Studstill did not ignore the sentencing aspect of the case. He was present, along with Ms. Griner, for meetings with family members, friends, and acquaintances from his employment. Mr. Studstill testified that the defense team considered calling a number of witnesses *1240 based on their relation to Appellant. In particular, Mr. Studstill discussed with Ms. Griner and Ms. Alderman whether Appellant’s ex-wife should testify, and he agreed that, due to the recent divorce, she would not be a favorable witness. Additionally, Mr. Studstill, along with other members of the defense team, became familiar with Appellant’s employment history.
Turning to Ms. Alderman, her testimony at the 1985 habeas hearing, if believed, is quite favorable to Appellant’s claim of ineffective assistance of counsel. For instance, she attested she was not prepared to proceed with the sentencing phase of the trial. Ms. Alderman also asserted that, other than the decision not to call Appellant’s ex-wife, no strategic decisions were made with respect to the sentencing phase. In addition, Ms. Alderman asserted that she conducted the entire Cook County trial herself — assertion clearly at odds with the trial record.[13] In sum, according to Ms. Alderman, it was just luck that some witnesses were available for the sentencing phase, and Appellant’s Cook County legal team had done nothing prior to the conclusion of the guilt/innocence phase to prepare for the sentencing phase.
The state habeas court, however, rejected Ms. Alderman’s version of events. Expressly relying on Mr. Studstill and Ms. Griner’s testimony, it found that “[p]reparation for the sentencing phase of the trial took place before trial, during trial, and during the recess between the guilt/innocence and sentencing phases of trial.” The court’s rejection of Ms. Alderman’s characterizations is supported by Ms. Alderman’s implicit admission that she was partial to Appellant’s cause.
Finally, Mr. Davis, one of Appellant’s Lowndes County attorneys, testified at the 1985 habeas hearing. He explained that he withdrew as Appellant’s counsel for the Cook County trial in large part because of an “irreconcilable difference of opinion” with Ms. Griner and Ms. Alderman. This difference of opinion centered on where to concentrate their efforts. According to Mr. Davis, Ms. Griner had a “very deep seeded belief that [Appellant] was innocent.” This belief interfered with Mr. Davis’s preferred legal strategy, which was to focus on the sentencing phase. As Mr. Davis explained at the 1985 hearing, “[I]f I had been in the [Cook County] case, my energies would have directed probably 80 percent to the sentencing phase.” In sum, Mr. Davis wanted the Cook County team to strictly follow the strategy of the Lowndes County team.
III. STANDARD OF REVIEW
The district court neither held an evidentiary hearing nor made any independent findings of fact. Therefore, its holding was one of law and is reviewed de novo. See Hill v. Moore, 175 F.3d 915, 921 (11th Cir.1999), cert. denied 528 U.S. 1087, 120 S.Ct. 815, 145 L.Ed.2d 686 (2000). Sitting as a federal habeas court, however, we (like the district court) are reviewing, in essence, a decision of the courts of Georgia. Since Appellant’s petition was filed after April 24, 1996, our review of state court decisions is governed by AEDPA. See Penry v. Johnson, 532 U.S. 782, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). In particular, 28 U.S.C. § 2254(d), as amended by AEDPA, provides;
(d) An application for a writ of habeas corpus on behalf of a person in custody *1241 pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
Furthermore, a state court’s factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).
Appellant does not dispute the factual findings of the Georgia courts. Therefore, neither § 2254(d)(2) nor § 2254(e)(1) is relevant to our inquiry. Rather, pursuant to § 2254(d)(1), Appellant challenges the legal rulings of the Georgia courts.
The “contrary to” and “unreasonable- application” clauses of § 2254(d)(1) are separate bases for reviewing a state court’s decisions. See Williams v. Taylor, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). A state court decision is “contrary to” clearly established federal law if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case. See Bottoson v. Moore, 234 F.3d 526, 531 (11th Cir.2000).
A state court conducts an “unreasonable application” of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner’s case. See id. An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context. See id. Notably, an “unreasonable application” is an “objectively unreasonable” application.[14] See Williams, 529 U.S. at 412, 120 S.Ct. at 1523.
Lastly, § 2254(d)(1) provides a measuring stick for federal habeas courts reviewing state court decisions. That measuring stick is “clearly established Federal law.” 28 U.S.C. § 2254(d). Clearly established federal law is not the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law “refers to the holdings, as opposed to the dicta, of [the Supreme Court’s] decisions as of the time of the relevant state court decision.”[15] Williams, 529 U.S. at 412, 120 S.Ct. at 1523.
*1242 IV. DISCUSSION
As previously discussed, the only claim for which Appellant has been granted a COA is ineffective assistance of counsel at the sentencing phase. See supra Part I. This claim was rejected by the state habe-as court in its order of April 4, 1989, which was affirmed by the Supreme Court of Georgia on July 12, 1989. In accordance with § 2254(d)(l)’s standard of review, we first set forth the pertinent landscape of clearly established federal law as of July 12, 1989. Then, considering the legal conclusions of the state habeas court (affirmed by the Supreme Court of Georgia), we analyze whether those conclusions were contrary to, or an unreasonable application of, clearly established federal law.
A. Legal Landscape
Appellant has not cited, and we have not found, any Supreme Court case, as of July 12, 1989, that is materially indistinguishable from the facts of the case sub judice. By that same date, however, it cannot be disputed that the benchmark for ineffective assistance of counsel claims was Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To the present day, Strickland has not been materially modified and continues to serve as the benchmark. See Williams, 529 U.S. at 391, 120 S.Ct. at 1512 (stating “the Strickland test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims”).
In Strickland, the Court established a two-prong standard for adjudicating ineffective assistance of counsel claims:
First, the [petitioner] must show that counsel’s performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel “guaranteed the [petitioner] by the Sixth Amendment.” Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. To gain relief, a petitioner must prevail on both prongs. See id.
B. “Contrary to" and “Unreasonable Application” Analyses
Having defined the boundaries of clearly established federal law for ineffective assistance of counsel, we quickly analyze, and reject, the notion that the state habeas court’s decision was “contrary to” clearly established federal law. Then, we look at the more debatable question: whether the state habeas court made an “unreasonably application” of clearly established federal law. See 28 U.S.C. § 2254(d)(1).
1. “Contrary To”
To reiterate, a state court’s decision is “contrary to” clearly established federal law either if it applies a rule contradictory to the governing law set forth by Supreme Court or if it arrives at a different result from a Supreme Court case when faced with a case containing materially indistinguishable facts. See supra Part III. In this case, the state habeas court correctly cited Strickland as the appropriate legal standard. Furthermore, the court correctly explained that Appellant could prevail under Strickland only if he could show both deficient performance and prejudice. As such, the state habeas court’s decision did not contradict governing law. Additionally, as already noted, there is no Supreme Court case that is materially indistinguishable from the facts of this case. See supra Part IV.A. Hence, the state habeas court’s decision was not contrary to clearly established federal law.
*1243 2. “Unreasonable Application”
Again, an “unreasonable application” is an “objectively unreasonable” application of federal law. See supra Part III. The state habeas court concluded that Appellant’s ineffective assistance claim failed on both the performance and prejudice prongs of Strickland. We first explain general principles of law related to the performance prong and then apply those principles to this case. We then set forth general principles related to the prejudice prong and apply those principles accordingly.
a. Deficient Performance
i. Principles of Deficient Performance[16]
For performance to be deficient, it must be established that, in light of all the circumstances, counsel’s performance was outside the wide range of professional competence. See Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. In other words, when reviewing counsel’s decisions, “the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’” Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir.2000) (en banc) (quoting Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)), cert. denied 531 U.S. 1204, 121 S.Ct. 1217, 149 L.Ed.2d 129 (2001). Furthermore, “[t]he burden of persuasion is on a petitioner to prove, by a preponderance of competence evidence, that counsel’s performance was unreasonable.” Id. (citing Strickland, 104 S.Ct. at 2064). This burden of persuasion, though not insurmountable, is a heavy one. See id. at 1314 (citing Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986)).
“ ‘Judicial scrutiny of counsel’s performance must be highly deferential,’ ” and courts “must avoid second-guessing counsel’s performance.” Id. at 1314 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. at 2065). “Courts must ‘indulge [the] strong presumption’ that counsel’s performance was reasonable and that counsel ‘made all significant decisions in the exercise of reasonable professional judgment.’ ” Id. (quoting Strickland, 466 U.S. at 689-90, 104 S.Ct. at 2065-66). Therefore, “counsel cannot be adjudged incompetent for performing in a particular way in a case, as long as the approach taken ‘might be considered sound trial strategy.’” Id. (quoting Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).
If the record is incomplete or unclear about counsel’s actions, then it is presumed that counsel exercised reasonable professional judgment. See id. at 1314-15 n. 15. Thus, the presumption afforded counsel’s performance “is not ... that the particular defense lawyer in reality focused on and, then, deliberately decided to do or not to do a specific act.” Id. Rather, the presumption is “that what the particular defense lawyer did at trial — for example, what witnesses he presented or did not present — were acts that some reasonable lawyer might do.” Id. (emphasis added).
Moreover, “[t]he reasonableness of a counsel’s performance is an objective inquiry.” Id. at 1315. . For a petitioner to *1244 show deficient performance, he “must establish that no competent counsel would have taken the action that his counsel did take.” Id. To uphold a lawyer’s strategy, a court “need not attempt to divine the lawyer’s mental processes underlying the strategy.” Id. at 1315 n. 16.
Finally, “[n]o absolute rules dictate what is reasonable performance for lawyers.” Id. at 1317. Absolute rules would interfere with counsel’s independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions. See id. As such, at a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel’s strategy. See id. at 1319 (citing Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir.1995) (en banc)). Counsel’s complete failure to present mitigation evidence does not necessarily constitute deficient performance, even if mitigation evidence is available. See Waters, 46 F.3d at 1511 (citing cases) (cited in Chandler, 218 F.3d at 1319).
ii. Application of Principles
Appellant’s argues that his Cook County lawyers were deficient in not replicating the strategy of the Lowndes County lawyers. The argument is flawed, as we stated in Chandler:
If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer’s pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer’s strategy was course A.... [0]ur inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.
Chandler, 218 F.3d at 1315 n. 16 (emphasis added). Moreover, “[t]he relevant question is not whether counsel’s choices were strategic, but whether they were reasonable.” Roe v. Flores-Ortega, 528 U.S. 470, 481, 120 S.Ct. 1029, 1037, 145 L.Ed.2d 985 (2000) (quoted in Chandler, 218 F.3d at 1315 n. 16).
In this case, the proper inquiry for the state habeas court was not whether Appellant’s Cook County lawyers acted reasonably in choosing their strategy over the Lowndes County strategy. Rather, the proper inquiry was “the reasonableness of [Cook County] counsel’s challenged conduct [based] on the facts of [this] particular case, viewed as of the time of [Cook County] counsel’s conduct.”[17] Strickland, 466 U.S. at 690, 104 S.Ct. at 2066. The burden was on Appellant to identify the acts and omissions of Cook County counsel that, in his view, were not the result of reasonable professional judgment. See id. After Appellant identified such acts and omissions, the state habeas court was then required to “determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.” Id. (emphasis added). Of course, one circumstance was the fact that Cook County counsel was cognizant of the Lowndes County sentencing strategy and its result.
Looking first at counsel’s acts,[18] Appellant fails to identify any act of *1245 Cook County counsel that falls outside the wide range of professional competence. Granted, the Cook County strategy perhaps could have been better. For instance, Mr. Davis, a Lowndes County attorney, faulted Ms. Griner for not putting more resources and more emphasis into the Cook County sentencing stage. However, “[t]est for ineffectiveness is not whether counsel could have done more; perfection is not required.” Waters, 46 F.3d at 1518. “Nor is the test whether the best criminal defense attorneys might have done more.” Id. Counsel almost always can do more, but the Constitution requires only that counsel act reasonably. Here, the state habeas court was objectively reasonable in concluding that the acts of Cook County counsel with regard to sentencing — though less than suggested by Mr. Davis — were nonetheless reasonable.
Turning to the omissions identified by Appellant, the first alleged unreasonable omission is a failure to investigate. In support of this contention, Appellant submitted affidavits by potential mitigation witnesses, many of whom did not testify at either trial.[19] See supra Part II.C.2.C. This contention lacks merit. The Cook County lawyers, either by personal experience, a review of the transcript, or both, were fully aware of the mitigation evidence presented at the Lowndes County trial— where Appellant concedes counsel performed reasonably. Since the Lowndes County lawyers unearthed sufficient mitigation evidence to render competent assistance, the Sixth Amendment did not mandate further investigation by the Cook County lawyers[20] — who, according to Appellant, could have freely borrowed from the investigative work of the Lowndes County lawyers. This is especially true considering that Ms. Griner was the lead counsel for both trials.
The second, and primary, omission identified by Appellant is a failure to present readily available mitigation evidence. As noted in Part II, Lowndes County counsel called nine witnesses, whereas Cook County counsel called only four witnesses. Appellant argues’that Cook County counsel was constitutionally compelled to call most or all of the witnesses from the Lowndes County sentencing. On this subject, the state habeas court concluded:
A review of the trial transcripts from the Cook County trial and the preceding Lowndes County trial indicate that the distinction between the testimony heard at the corresponding sentencing phases was the number of witnesses testifying, while the substance of their testimony was very similar. Counsel at the Cook County trial made a strategic decision in regard to what mitigating evidence to *1246 present. In examining the substance of the testimony, this Court finds that trial counsel’s actions were reasonable in light of the circumstances at the Cook county trial.
To determine whether this legal conclusion was objectively reasonable, we examine each of the witnesses who testified in Lowndes County but not in Cook County.
First, Appellant’s former wife divorced him shortly before the Cook County proceedings. Ms. Griner testified that Appellant’s ex-wife was too upset to testify. All three Cook County attorneys agreed that, due to the recent divorce, calling Appellant’s ex-wife would be imprudent. Even Ms. Alderman, who was markedly biased in favor of Appellant at the 1985 habeas hearing, conceded a strategic decision was made not to call Appellant’s ex-wife.
Second, besides Appellant’s ex-wife, three of the four other relatives who testified in Lowndes County did not testify in Cook County. Only two relatives testified at the Cook County trial — Appellant’s sister (who also testified in Lowndes County) and Appellant’s niece (who did not testify in Lowndes County). As the state habeas court indicated, however, the testimony of the five Lowndes County relatives was substantially the same as the testimony of the two Cook County relatives. Calling the three additional relatives to the stand would have been cumulative. More of the same is not necessarily better. See Chandler, 218 F.3d at 1319.
Third, Ms. Griner’s testimony in Lowndes County was not substantially different from the testimony of Appellant’s sister and niece. More importantly, however, rules of professional conduct generally disapprove of lawyers testifying at proceedings in which they are also advocates. See, e.g., Model Rules of Profl Conduct R. 3.7(a) (2001) (stating that “[a] lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness....”); Model Code of Profl Responsibility EC 5-9 (1969) (stating, “[a]n advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility,” and “[t]he roles of an advocate and a witness are inconsistent”). Although an attorney has an “ethical duty to advance the interest of [her] client,” that duty “is limited by an equally solemn duty to comply with the law and standards of professional conduct.” Card v. Dugger, 911 F.2d 1494, 1503 (11th Cir.1990) (internal quotations omitted). Ms. Griner’s decision to testify on behalf of her client in Lowndes County was arguably unethical. But one cannot plausibly argue that she acted unprofessionally when, in accordance with ethical norms, she did not testify in Cook County.
Fourth, one of Appellant’s co-workers testified at Lowndes County, but he did not testify at the Cook County trial. Presumably, a co-worker would shed light on Appellant’s character away from home and on the road. Nevertheless, the co-worker’s testimony was not significantly different, in substance, from that of Appellant’s sister and niece. On cross-examination at the Lowndes County trial, the co-worker conceded he had not driven on the road with Appellant and was unaware of Appellant’s drug and alcohol habits while on the road. Based on this cross-examination, reasonable counsel could have decided against calling the co-worker in Cook County. Cf. Chandler, 218 F.3d at 1322 (noting that trial counsel acts reasonably by not calling a character witness for fear of damaging cross-examination). Furthermore, the state habeas record lacks any evidence that the co-worker was willing and able to testify in Cook County. Where the record is incomplete or unclear, a court must presume that counsel acted reasonably. See Williams v. Head, 185 F.3d 1223, 1227-28 (11th Cir.1999), cert. denied, 530 U.S. 1246, 120 S.Ct. 2696, 147 L.Ed.2d 967 (2000).
*1247 Nonetheless, Appellant did present to the state court a number of affidavits from co-workers and friends who swore they would have testified for Appellant, if asked. No doubt, personal testimony from a non-family member probably would have been helpful to Appellant. This appears to be true (albeit in hindsight) in light of the Cook County prosecutor’s argument in closing about Appellant’s lack of friends. Ms. Griner attempted to procure testimony from Appellant’s co-workers and friends. In fact, Ms. Griner thought a neighbor would appear, but at the last minute, she learned otherwise. Moreover, Ms. Griner tried to locate a co-worker (suggested by Appellant) who had been on the road with Appellant, but the co-worker could not be found. In any event, rather than rely on a co-worker, Ms. Alderman informed the jury about Appellant’s trouble-free employment history through the testimony of a law enforcement officer (the GBI agent).[21] Finally, Ms. Alderman rebutted the prosecutor’s contention that Appellant lacked friends, by explaining in closing argument that Appellant’s friends lived a great distance away.
Cook County counsel perhaps could have done more to procure the testimony of coworkers and friends. For instance, counsel possibly could have subpoenaed a coworker (even though the witness suggested by Appellant could not be located and thus could not have been served). But just because counsel might have done more does not mean counsel was incompetent. See Chandler, 218 F.3d at 1313.
Fifth, a deputy from the prison where Appellant was incarcerated testified at the Lowndes County trial, but not at the Cook County trial. Every reasonable counsel, Appellant argues, would have called the prison deputy to testify, because such a witness would have shown Appellant to be a model prisoner whose death would be a loss to society. Like the co-worker witness, however, Appellant has not shown the prison deputy was willing or available to testify at the Cook County trial. No evidence was presented to the state habeas court that the prison deputy, or any other prison official, was -available or willing to give favorable testimony. Again, where the record is unclear, we must presume counsel acted reasonably.[22] See Chandler, 218 F.3d at 1314-15 n.15.
In sum, Appellant’s primary contention is that Cook County counsel provided ineffective assistance by failing to present a replica of the Lowndes County mitigation case. In accordance with our discussion above, however, the state habeas court’s conclusion that Cook County counsel performed competently pursuant to Strickland is objectively reasonable, even in light of the fact that Cook County counsel was aware of the Lowndes County strategy and its success in avoiding the death penalty for a different murder with different aggravating circumstances.[23]
*1248 b. Prejudice
i. Principles of Prejudice
To show prejudice, it must be established that, but for counsel’s unprofessional performance, there is a reasonable probability the result of the proceeding would have been different. See Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. “It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding ...,” because “[v]irtually every act or omission of counsel would meet that test.” Id. at 693, 104 S.Ct. at 2067. Nevertheless, a petitioner “need not show that counsel’s deficient conduct more likely than not altered the outcome in the case.” Id. at 693, 104 S.Ct. at 2068. Rather, where, as here, a petitioner challenges a death sentence, “the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Id. at 695, 104 S.Ct. at 2069.
One Strickland principle is particularly pertinent to the case sub judice:
In making the determination whether the specified errors resulted in the required prejudice, a court should presume ... that the judge or jury acted according to law. An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, “nullification,” and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards. that govern the decision.
Id. at 694-95, 104 S.Ct. at 2068.
ii. Application of Principles
We already have held that the state habeas court was not objectively unreasonable in concluding that counsel rendered competent assistance. The state court held, as an additional basis for denying relief, that Appellant failed to satisfy the prejudice prong of the ineffective assistance standard: our inquiry as to that holding is whether the state habeas court was objectively reasonable in concluding that Appellant was not prejudiced by the failure of Cook County counsel to present the Lowndes County mitigation case.
Regarding prejudice, the state habeas court concluded:
The murders in Cook County were committed in a more egregious manner than the murder in Lowndes County. There were two victims instead of one, and the murders took place in the presence of the victims’ children.
The murders in Cook County were observed' by three eyewitnesses, and were committed without any provocation on the part of the victims.... The evidence in the Lowndes County case, while certainly sufficient to authorize conviction, was more circumstantial in nature. [Appellant] has not shown this Court that he was prejudiced by the *1249 strategic choices made by trial counsel....
A core premise underpinning Appellant’s argument is that the Cook County and Lowndes County trials concerned essentially the same crime. As the state habeas court recognized, however, the juries in Cook County and Lowndes County did not sentence Appellant for the same crime.
The foregoing is demonstrated by the fact that the two juries received quite distinct instructions. See supra Part III. C.3. Appellant’s argument depends on the assumption that the Lowndes County jury must have considered the Cook County murders, because evidence about the Cook County murders was admitted. We cannot accept this assumption because it is contrary to Strickland. Strickland teaches that courts must assume “the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision.” 466 U.S. at 695, 104 S.Ct. at 2068. In the Lowndes County case, the “standard” for the jury to consider encompassed two aggravating circumstances (the armed robbery of Hodges and the commission of an armed robbery for the purpose of receiving things of monetary value). Neither of these circumstances concerned events in Cook County. The Lowndes County jury did not find Appellant guilty of either aggravating circumstance; without such a finding, the Lowndes County jury could not impose death. Simply put, the jury instructions forbade the Lowndes County jury from considering the events in Cook County during the penalty phase, and pursuant to Strickland, we assume the Lowndes County jurors followed their instructions.
In contrast, the Cook County jurors were permitted, in accordance with their instructions, to consider both the Cook County murders and the Lowndes County murder as aggravating circumstances, as well as the armed robbery in Cook County. Interestingly, the Cook County jury did not rely on the Lowndes County murder as an aggravating circumstance. Instead, the Cook County jury, in imposing death, relied solely on events in Cook County as aggravating circumstances. By comparison, the Lowndes County jury did not rely on any events in Cook County.
As the state habeas court noted, the Cook County murders were supported by very strong evidence, and the murders were particularly egregious — two parents killed in front of their small children. As indicated by our discussion regarding the performance prong, the evidence presented at the two sentencing phases differed only in volume, not in substance. Additional mitigation evidence of Appellant’s good character probably would not have overcome the strong aggravating circumstances supporting death. Therefore, the state habeas court was objectively reasonable in concluding that, even if the Cook County jury had heard the Lowndes County mitigation case, there was not a reasonable probability Appellant would have received a life sentence.
V. CONCLUSION
Appellant has failed to show that the courts of Georgia made a decision that was contrary to, or an unreasonable application of, clearly established federal law. Therefore, the district court correctly denied Appellant’s petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.
AFFIRMED.

. Appellant’s claims under this issue are based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In particular, Appellant alleges the following items were material and withheld by the prosecution: (1) a portion of a summaiy of Appellant’s interview with a state psychologist, (2) a report about a caller claiming that other persons had seen a blonde man commit the murders, (3) information that, while Appellant was incarcerated, witness Dessie Harris told agents she had seen the murderer in a Michigan rest stop, (4) a statement by witness Beverly Culvery, the niece of the victims, that the murderer called her aunt, Katie Christine Back, by the name "Christine,” and (5) information that one of the arresting police officers lied about where precisely he found Appellant's gun in the truck.

. Appellant’s claims under this issue are based on Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In particular, Appellant argues (in approximately three pages of his initial brief) that trial counsel acted ineffectively by: (1) failing, at the suppression hearing, to attack the reliability of witness Brad Back (the victims' six-year-old child), thereby waiving any challenge to the probable cause underlying Appellant's arrest and the evidence gained therefrom; (2) failing to challenge the identification testimony of the three eyewitnesses; (3) failing to investigate the family’s landlord, whom Brad Back initially identified as the assailant; (4) failing to discover or investigate the fact that Beverly Culver, the niece of the victims, told investigators that the murderer called her aunt, Katie Christine Back, by the name "Christine”; (5) failing to challenge the physical evidence (the blood on Appellant's pants and the dent on William Hodges’ car); (6) failing to interview out-of-town prosecution eyewitnesses prior to trial; (7) failing to object to the prosecution's alleged comment on Appellant’s post-arrest silence; (8) failing to introduce evidence that others had a motive to kill William Hodges; (9) failing to introduce evidence that fingerprints, tire tracks, and footprints at the scene of William Hodges’ murder did not match those of Appellant; (10) failing to introduce evidence that witnesses saw a white van leaving the scenes of both crimes; and (11) making imprudent comments during opening and closing statements.

.With respect to the first issue, Appellant raises five Brady claims. See supra note 1. After holding an evidentiary hearing, the state habeas court, in its order dated July 1, 1994, rejected six Brady claims, including the five raised here. See infra note 4.
Appellant's fifth claim, alleging police fabrication about the location of the gun, was rejected by the state habeas court as being procedurally barred under Georgia law. See O.C.G.A. § 9-14-51. Appellant has shown neither cause and prejudice nor a fundamental miscarriage of justice. Therefore, we are precluded from considering this claim. See, e.g., Mincey v. Head, 206 F.3d 1106, 1135-36 (11th Cir.2000) (citing Coleman v. Thompson, 501 U.S. 722, 750, 111 S.Ct. 2546, 2564-65, *1229 115 L.Ed.2d 640 (1991)), cert. denied - U.S. -, 121 S.Ct. 1369, 149 L.Ed.2d 297 (2001). The state habeas court rejected the other four claims on the merits. In doing so, the court made factual findings crediting the testimony of Appellee's witnesses. On each claim, the court concluded Appellant had failed to show Appellee possessed the alleged exculpatory materials. In addition, on the first two claims (concerning the summary of the psychologist's interview and reports about a blonde-hair killer), the court concluded Appellant could not show prejudice as required by Brady. Appellant has not shown, by clear and convincing evidence, the factual findings of the state habeas court were incorrect. See 28 U.S.C. § 2254(e)(1). Furthermore, the legal conclusions of the state habeas court were neither contrary to, nor an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d)(1).
With respect to the second issue, Appellant raises 11 Strickland claims. See supra note 2. These claims are without merit. As we discuss below, the evidence showing Appellant’s guilt was overwhelming. See infra Part II.A. Assuming arguendo that trial counsel’s actions and omissions constituted deficient performance, Appellant has utterly failed to show that, but for these alleged deficiencies, there is a reasonable probability the jury would have found Appellant not guilty. This failure to show prejudice dooms Appellant’s ineffective assistance claims for the guilt/innocence phase of the trial. See Strickland, 466 U.S. at 694, 700, 104 S.Ct. at 2068, 2071.

. In June 1992, Appellant filed a second petition for writ of habeas corpus in stale court. *1233 The state habeas court dismissed most of Appellant's claims as being successive, but the court held a hearing on Appellant's six claims based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). After the hearing, the state habeas court denied relief, finding one claim to be successive and the remaining five to lack merit. The state's high court denied Appellant’s application for a certificate of probable cause, and on April 20, 1995, rehearing was denied. The United States Supreme Court denied certiorari on December 4, 1995, and denied rehearing on January 22, 1996. See Putman v. Thomas, 516 U.S. 1012, 116 S.Ct. 570, 133 L.Ed.2d 494 (1995), reh’g denied, 516 U.S. 1099, 116 S.Ct. 829, 133 L.Ed.2d 771 (1996). Since we have held Appellant’s Brady claims lack merit and do not warrant a COA, see supra Part I & n.3, this second state habeas proceeding is not relevant to our discussion.

. In accordance with 28 U.S.C. § 2254(e)(1), we presume the factual findings of the state habeas court are correct, since Appellant has not presented clear and convincing evidence to the contrary.

. The Lowndes County counsel did not call a mental health expert.

. Appellant's sister, who was older than Appellant, claimed to be a "second mother” to Appellant. She told the jury the following facts: (1) Appellant was close to all his brothers and sisters; (2) Appellant was a loving, considerate child who never caused any problems; (3) Appellant, as a young boy, worked odd jobs, such as delivering papers and groceries and mowing yards, using his income to support his family; (4) Appellant loved his children, wife, and family; (5) Appellant was non-violent, a "good person,” a "fine man,” and a "family man;” (6) While awaiting trial in prison, Appellant wrote many letters, inquiring about the family, especially Appellant's father; (7) during the week of July 4th prior to Appellant’s arrest, Appellant hosted family members for a week-long gathering. Additionally, he had a barbecue for family, friends, and neighbors, and did most of the preparations himself; and (8) Appellant’s death would be a loss, especially for his family.
Appellant’s 19-year-old niece had lived periodically with Appellant since she was 8, and she considered Appellant's house to be her home. The niece told the jury the following facts: (1) She thought of Appellant as a "daddy” and "a very good friend” with a "great sense of humor;” (2) Appellant was "loving,” "kind,” and "honest;” (3) Appellant minded his own business, loved his family very much, and always worked very hard; (4) the niece had never heard Appellant tell a lie or seen him act violently; (5) Appellant had taught the niece a great many character traits, including honesty; (6) Appellant had successfully encouraged the niece to attend college; (7) Appellant treated the niece quite well, giving her money when needed; (8) since entering prison, Appellant had written the niece promising that he would help pay for her college education if possible; (9) Appellant called the niece from prison to inquire how she was doing in school; (10) Appellant never expressed concern for himself, only for others; and (11) it would be a loss if Appellant were to die.

. One affidavit was a one-and-half page opinion from a psychiatrist. The psychiatrist asserts that Appellant should have received a psychiatric evaluation. The psychiatrist based his opinion on the other affidavits, a conversation with state habeas counsel, and the facts narrated in the Georgia Supreme Court's opinion on direct appeal.

. This reciprocal instruction was, in part, error under Georgia law. As the Georgia Supreme Court noted on direct appeal, the jury could have imposed the death penalty for one murder by using the second murder as an aggravating circumstance. See Putman v. State, 251 Ga. 605, 308 S.E.2d 145, 153 (1983). But the jury could not impose two death penalties (i.e. one for each murder) where the only aggravating circumstance for each murder was the other murder. See id. (citing Burden v. State, 250 Ga. 313, 315-16, 297 S.E.2d 242 (1982)). Nonetheless, this error was harmless under Georgia law because, for both the Hardin and Back murders, the jury had relied on an independent aggravating circumstance (the Hardin armed robbery). Most importantly, for purposes of our discussion here, this error is irrelevant because, unlike the Lowndes County jury, the Cook County jury was permitted to consider at least one of the Cook County murders as an aggravating circumstance for one of the two death penalties it imposed.

. For one of the two death penalties, the Georgia Supreme Court found it to be error (albeit harmless) under Georgia law for the jury to rely on the reciprocal murder charge as an aggravating circumstance. See supra note 9.

. Interestingly, Appellant’s state habeas counsel called Mr. Davis, Mr. Studstill, and Ms. Alderman to testify at the 1985 hearing, but did not call Ms. Griner as a witness. Rather, Appellee called Ms. Griner in order to give the state habeas court a full view of Appellant’s Cook County legal representation.

. In contrast to Mr. Studstill's experience in Cook County, Mr. Davis — Appellant's Lowndes County counsel, who did not think the death penalty was inevitable — had tried one case in Cook County.

. Ms. Alderman’s assertion contradicted, at least, the following undisputed facts: Ms. Gri-ner was present and sitting next to Ms. Aider-man for the entire trial; Ms. Griner conducted voire dire; Ms. Griner made numerous evidentiary objections during the trial; Ms. Griner examined Appellant; Ms. Griner made the closing argument for the guill/innocence phase; and Mr. Studstill made a lengthy legal argument about the sentencing instructions.

. By interpreting "unreasonable application” as "objective unreasonableness,” the Supreme Court in Williams rejected the "reasonable jurist” standard announced by this Court in Neelley v. Nagle, 138 F.3d 917, 924-25 (11th Cir.1998). See Parker v. Head, 244 F.3d 831, 835 (11th Cir.2001) (citing Williams, 526 U.S. at 409-10, 120 S.Ct. at 1521-22). Here, the district court rendered its decision prior to Williams and thus applied the Neelley "reasonable jurist” standard. See Putman, 53 F.Supp.2d at 1297. Appellant argues this error requires a remand. We disagree. Our plenary power of de novo review enables us to correct legal errors where further factfinding is unnecessary. See Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1266 n. 13 (11th Cir.), reh’g denied, 206 F.3d 1397 (11th Cir.2000). In this case, the district court made no independent findings of fact, so its decision was one of pure law.

. When we mention "clearly established federal law” in this opinion, we are referring to the definition set forth in the text.

. Recently, in Chandler v. United States, 218 F.3d 1305 (11th Cir.2000) (en banc), we fully explained the principles underlying deficient performance in the context of the sentencing phase. These principles flow from three Supreme Court cases decided before July 12, 1989 — the date on which the Supreme Court of Georgia affirmed the decision of the state habeas court. See id. at 1313 n. 10 (citing Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Here, we summarize the most pertinent principles from Chandler.

. Of course, our task is not to repeat this inquiry. Instead, our duty is to determine whether the state habeas court was objectively reasonable in its Strickland inquiry. See supra Part III.

. As is evident from our discussion above, see supra Part II.C.4, Cook County counsel pursued a two-prong strategy. Ms. Griner attempted to prove Appellant’s innocence (and avoid sentencing), but she also spent time preparing for Appellant's sentencing. On the other hand, Mr. Studstill, relying on his experience, was convinced that a Cook County jury would convict and impose death; *1245 Mr. Studstill thus chose to inject error into the trial so the conviction or sentence could be reversed on appeal.

. We previously have spoken unfavorably of such affidavits:
It is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating circumstance evidence, had they been called, or, if they were called, had they been asked the right questions.... But the existence of such affidavits, artfully drafted though they may be, usually proves little of significance.
Waters, 46 F.3d at 1513-14.

. Besides there being no constitutional requirement for the Cook County lawyers to procure additional character witnesses, Appellant has not shown that the Cook County lawyers acted incompetently in failing to present expert psychiatric testimony. No such testimony was presented in Lowndes County, where Appellant concedes his counsel was competent. Furthermore, the lone affidavit from a psychiatrist in the state habeas record is purely conclusory and of little, if any, evi-dentiary value. Cf. Waters, 46 F.3d at 1514 (rejecting conclusory affidavit presented by psychologist).

. Appellant's present habeas counsel criticizes this decision since the GBI agent did not personally know Appellant, but in the same brief, counsel argues that having testimony from law enforcement officials is a sound strategy.

. More than a year elapsed between the Lowndes County and Cook County trials. It is entirely possible that the prison deputy’s opinion of Appellant changed in that time, or that for some other reason, the prison deputy was no longer willing or able to present the same testimony.

.Appellant relies heavily on our decision in Collier v. Turpin, 177 F.3d 1184, 1198-1204 (11th Cir.1999). Collier is distinguishable in at least two ways. First, in Collier, we addressed a pre-AEDPA claim; as such, we were not required to accord the same level of deference to state court decisions, as we are now required to do post-AEDPA. See Williams, 529 U.S. at 402-03, 120 S.Ct. at 1518.
*1248 Second, in Collier, trial counsel’s examination gave the jury "the impression that the witnesses knew little or nothing about [the petitioner.]” 177 F.3d at 1202. Counsel failed to "develop[ ] an image of [the petitioner] as a human being who was generally a good family man and a good public citizen, who had a background of poverty but who had worked hard as a child and as an adult to support his family and close relatives.” Id. By contrast, in this case, Ms. Alderman, through her direct examination of Appellant's sister and niece, presented Appellant as a good family man who had worked hard as a child and as an adult to support his family and relatives. See supra note 7.