**[PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 25, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-15313

_____

D. C. Docket No. 97-00723-CV

WILLIE JAMES HALL,

Petitioner-Appellee,
Cross-Appellant,

versus

FREDERICK HEAD, Warden,

Respondent-Appellant,
Cross-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(October 25, 2002)

Before DUBINA, BLACK, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Willie James "Bo" Hall filed a petition for a writ of habeas corpus in federal

district court challenging both his 1989 conviction for the murder of his wife,

Thelma Hall ("Ms. Hall"), and the death sentence imposed by the Superior Court of DeKalb County, Georgia. The district court granted his petition in part, finding that Hall's counsel was constitutionally ineffective at the sentencing phase of his trial, and denied his petition in part, concluding that counsel was not otherwise constitutionally ineffective and that Hall was not entitled to an evidentiary hearing or access to further psychological testing. Although we agree with the district court that the underlying conviction was devoid of any constitutional error, and that the denial of a hearing and access was proper, we are not convinced that the sentencing portion of Hall's trial was constitutionally flawed. Accordingly, we reverse the district court's order regarding the sentencing phase of the trial and remand the case with instructions to reinstate Hall's sentence of death.

I.

A.

This case involves the stormy and unhappy marriage of the defendant, Willie James Hall, and, ultimately, the brutal murder of his wife, Ms. Thelma Hall. The essential facts are undisputed.

Willie James Hall enlisted in the Army following graduation from high school. Upon completion of a four-year Army term, Hall returned home to Columbus, Georgia, where he pursued a bachelor's degree of science at Columbus

College. While he was in college, Hall met Thelma Burns (Ms. Hall), and dated her for about two and one-half years before marrying her in November 1982. After finishing college and getting married, Hall was commissioned back into the Army, this time as a second lieutenant, and the Halls initially were stationed at Fort Dix, New Jersey.

Almost from the beginning, the Halls had a tumultuous marriage. They would constantly fight and undergo extended periods of separation. Hall testified at sentencing that the separations were due to marital problems involving perceived financial difficulties, conflicting personality types, and Ms. Hall's distance from her family. Ms. Hall's sister, Janice Sanks, once visited them at Fort Dix. She testified that she saw evidence of substantial marital discord. Indeed, she said that on one occasion, she saw Hall grab her sister by the hair and pull her into a room, making noises for almost an hour that indicated he was banging her head against the wall. From behind closed doors, Ms. Hall was overheard saying, "Stop it, Bo, stop it." "Bo" is Hall's nickname. Sanks remembered that during the visit, Hall told her that "he was going to end up killing [Ms. Hall] one of these days." Hall also told her that her sister had given him a venereal disease.

In May 1985, Hall was promoted from second lieutenant to first lieutenant, and the couple relocated to St. Louis, Missouri where Hall worked at a military

processing station.  There, the marital problems continued.  They enrolled in a nine-week family advocacy program, but Ms. Hall left for Columbus after the first two weeks.  Hall finished the nine-week program.  Ms. Hall returned to St. Louis pregnant with the couple's child, and the couple again saw a marriage counselor.  At a marriage counseling class, Hall voiced his opinion that he did not need to go through counseling since he had already attended the nine-week course.

Not long thereafter, Ms. Hall complained to Hall's military supervisor at work, Major Stanford, that Hall refused to take the counseling class.  She also told Major Stanford that Hall was not paying the bills and that there was not enough food in the house.  Hall denied these claims.  After speaking with his supervisor, Hall abruptly resigned from the Army in August 1986, while he was being considered for promotion to Captain.

On August 5, 1986, the couple's daughter Tiara was born.  Shortly thereafter, Ms. Hall returned to Columbus and Hall departed for California.  After reaching California, Hall spoke with Ms. Hall on the phone and returned to Columbus.  While back in Columbus, Hall lived with his mother; Ms. Hall and Tiara lived with Ms. Hall's grandmother, although Hall would spend some nights at the grandmother's house. Throughout this period, the marriage continued to deteriorate.  Hall again left for California several times, but always returned.  By

4

January 1988, Hall moved to Atlanta where he began working at a Chick-Fil-A restaurant.

Around April 1988, Ms. Hall and Tiara also moved to Atlanta, where they stayed in an apartment with Ms. Hall's sister, Antoinette Ware ("Ware"), Ware's boyfriend, Ben Marshall ("Marshall"), and Ms. Hall's brother, Everette Burns ("Burns"). Hall did not live with them, and at first, did not know that Ms. Hall had moved to Atlanta. One night, he went over to Ware's house and was surprised to see Ms. Hall when she opened the door. They talked, and he began visiting her regularly.

Sometime in May, Hall moved into Ware's apartment. By July, Ms. Hall was dissatisfied that Hall had not found them an apartment of their own. At this time, Hall had started working at the Kidney Foundation Thrift Store as a manager/trainee. Over the weekend of July 4, Ms. Hall went home to Columbus and dropped her daughter off at her grandmother's house. The couple argued, apparently because Hall wanted their daughter brought back to Atlanta.

Ms. Hall returned to Atlanta a few days later and stayed with her brother's girlfriend, Valerie Hudson ("Hudson"). Ware testified that Ms. Hall felt uncomfortable staying in Ware's apartment because Hall was still staying there, and she did not want Hall to know where she was.

On Saturday evening, July 9, 1988, Ms. Hall, Hudson, Burns, and Sebastian (a friend of Burns) came over to Ware's apartment to get some of Ms. Hall's clothes. When Hall heard his wife's voice, he came out of his bedroom and tried to get her to step outside and talk, but she refused.

After collecting her things, Ms. Hall went out that night with Hudson, Burns, and Sebastian. As the group returned home early Sunday morning, they saw Hall lurking around Hudson's apartment. Ms. Hall asked the group to pretend they did not see him and to continue driving. The group later returned and spent the night at Hudson's apartment. Ms. Hall apparently slept on the couch in the living room, while Sebastian slept on the floor. Ware, Hudson, and Burns all testified that Sebastian was not having a relationship with Ms. Hall.

After being observed outside of Hudson's apartment, Hall spent the night sleeping in a "field." On Sunday evening, July 10, Hall returned to Ware's apartment, and had a conversation with Ware and Marshall about the fact that Ms. Hall had moved out. Vicki Gardner, Ware's next-door neighbor, was also present. During this conversation, Ware, Marshall, and Gardner all heard Hall threaten to kill his wife. According to Marshall, Ware told Hall that Ms. Hall had moved out, and "he got kind of angry with that . . . and said 'I am gonna kill her' . . . about a dozen [times]." Ware observed that Hall "was pretty upset because [Ms. Hall] had

6

moved out. He said, you know, that he was tired of it," and that "he knew deep down inside he could really hurt her." Gardner noted that "he just said he was upset and that he wouldn't let her get away with that. And he just said something like he would, he could kill her." Notably, all three witnesses also heard Hall ruminate about what would happen to him if he killed his wife -- two of the witnesses, Ware and Marshall, testified that Hall said he would not get "more than ten years" in jail, and Gardner recalled Hall saying that "he would get about ten or twenty years." The group talked to Hall for hours, trying to convince him that he could find another woman, and trying to calm him down. Hall then told them that he was going back to Columbus, and went to bed.

That same night, when Ware was cooking dinner, she noticed that her kitchen knife was missing. She later testified that she "never thought nothing else about the knife" until her neighbor, Gardner, said to her after Ms. Hall's death that she knew where the knife was. When Ware awoke Monday morning at around 6:00 a.m., Hall was not in the apartment. Marshall found a note in the apartment that said: "Annette and Ben, I am hitchhiking to Columbus, so I left early. Thank both of you for everything and as soon as they mail me my check I'll send both of you some money." The note was signed "Bo."

At about 7:40 a.m., Monday, July 11, 1988, Hudson left her apartment and took Burns and Sebastian to work. Ms. Hall was still at the apartment, asleep on the sofa, when they left. At 7:58 a.m., a DeKalb County operator received a frantic 911 call from Ms. Hall at Hudson's apartment. During the call, Ms. Hall told the operator that someone was trying to break into the apartment, but that she did not know who was outside. These statements by Ms. Hall were followed by the sound of breaking glass, and Ms. Hall's repeated pleas, "Bo, stop it please, Bo stop it." The call ended with Ms. Hall's final words, "Stop Bo please. Oh God . . . Oh."[1]

---

[1]In full, the recording of the transcript reads:

> No ... Stop, stop, stop Bo ... stop it
> Stop it, stop it
> Bo stop it, stop it the police are on the way
> Please, Bo, quit it
> Bo, stop
> Bo, stop it please
> Bo, stop it
> Bo, stop, stop it
> Stop it ...
> Please Bo, please stop
> Stop it
> Oh God
> Stop Bo
>
> Bo, please, please
> Bo please
> Bo, Bo stop
> Stop Bo please
> Oh God ... Oh ...

Ms. Hall's murder was partially observed by Pamela Rathbone, an apartment complex resident. Although Rathbone could not identify Hall as the murderer, she testified that she saw a "fairly slender black girl" wearing a slip, run out of an apartment chased by a man, and heard the girl saying "something to the effect" of "don't, stop." When Rathbone came closer to the apartment, she saw that the apartment door was open, the girl was "lying on the floor, and [the man] was standing over her with his fist raised."

Within minutes of Ms. Hall's phone call, the police arrived and discovered a black female, later identified as Ms. Hall, lying next to the open door with a knife sticking out of her back. She suffered four stab wounds to the neck, three to the back, and various other stab wounds to the chest, abdomen and arms. The police specifically noticed a large slash across her neck and a large quantity of blood covering her chest, stomach, and the surrounding floor. The DeKalb County Medical Examiner, Dr. Burton, later observed that Ms. Hall had been stabbed <u>seventeen</u> times in her neck, torso and extremities, and that at least "seven or eight" of those seventeen wounds were potentially fatal. One stab wound was eight inches deep and went completely through her liver and down into the back of her

---

Hall, 383 S.E.2d at 130.

abdomen.  She also received a series of wounds in a crisscrossing pattern on her neck.

The Medical Examiner said at trial that the majority of her wounds were consistent with her being on the ground when she was stabbed.  He further surmised that Ms. Hall was aware of the injuries she sustained, and that she likely died within five minutes of the time they were inflicted.  Finally, he observed that the nature and number of her wounds were indicative of "overkill," which "sometimes, oftentimes, imparts that there is an emotional involvement between the two parties."

Further testimony elicited at trial revealed that Hall's fingerprints matched those lifted at the crime scene, and that shoe prints matching Hall's tennis shoes were found at the scene.

On July 14, 1988, three days after the murder, Hall called the Clinton, Mississippi police department and indicated that he was wanted for a crime.  When the officers picked him up, they noticed cuts on his hand.  Soon after his arrest, he was brought to Atlanta to face charges, where he met Lynn Whatley ("Whatley"), the attorney his mother had hired.  Shortly thereafter, Whatley asked attorney Tony Axam ("Axam") to assist him.  Axam successfully moved the trial court to appoint

10

him as counsel, as Hall was indigent. A protracted legal battle was then set in motion.

B.

On September 12, 1988, a DeKalb County grand jury indicted Hall on charges of malice murder, burglary, and felony murder. He pled not guilty. Prior to trial, the State offered Hall a plea to the malice murder charge with a life sentence. Hall rejected the plea against his lawyers' advice, and the case proceeded to trial.

On February 2, 1989, after the jury heard the evidence, Hall was found guilty on all counts. The penalty phase of the trial occurred the next day. The jury returned a verdict finding the existence of statutory aggravating circumstances under section 17-10-30 of the Georgia Code, and recommending the imposition of the death penalty. Specifically, the jury found that the murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." O.C.G.A. § 17-10-30(b)(7). The jury also found that the "offense of murder was committed while the offender was

11

engaged in the commission of a burglary." O.C.G.A. § 17-10-30(b)(2). The trial court sentenced Hall to death.[2]

Hall's motion for a new trial was denied, and Hall's sentence was affirmed on appeal by the Georgia Supreme Court. See Hall v. State, 383 S.E.2d 128 (Ga. 1989). On October 1, 1990, the United States Supreme Court denied a petition for writ of certiorari filed on Hall's behalf, see Hall v. Georgia, 498 U.S. 881, 111 S. Ct. 221, 112 L. Ed. 2d 177 (1990), and later denied his petition for rehearing. See Hall v. Georgia, 498 U.S. 994, 111 S. Ct. 543, 112 L. Ed. 2d 552 (1990).

On February 7, 1992, proceeding with new counsel, Hall filed a petition for writ of habeas corpus in the Superior Court of Butts County, Georgia, raising, among other things, the claim that Hall's counsel had provided ineffective assistance in violation of his Sixth Amendment right to counsel. On October 16, 1992, Hall filed a motion for access to conduct a psychological examination in preparation for a state evidentiary hearing on the habeas petition. The state habeas court granted Hall's motion for access, and a preliminary psychological evaluation was conducted by Dr. Dennis Herendeen the day before the hearing.

---

[2]The trial court did so under the authority of O.C.G.A. § 17-10-31, which provides that where the jury verdict "includes a finding of at least one statutory aggravating circumstance and a recommendation that [a sentence of death] be imposed[,] . . . the court shall sentence the defendant to death."

On October 20, 1992, the day of the hearing, Hall amended his habeas petition to include eighteen grounds contained in 127 paragraphs. Hall's counsel requested a continuance based on a lack of preparation, but the state habeas court deferred ruling on the motion. That same day, the trial court conducted an evidentiary hearing on the amended petition, and counsel presented the evidence that was available at that time. In particular, Dr. Herendeen testified as to his preliminary psychological evaluation of Hall. Additionally, both of Hall's trial counsel, Whatley and Axam, testified as to their conduct before and during Hall's trial. On November 17, 1992, the state habeas court issued a written order denying Hall's motion for a continuance. The state habeas court issued a written order denying in all respects Hall's state habeas petition on July 30, 1993. The court determined, among other things, that Hall had failed to show that his counsel had provided ineffective assistance at trial or at sentencing. In so holding, the state court acknowledged that Hall's trial counsel admitted to performing deficiently at both the guilt-innocence and sentencing phases of Hall's trial. The court nonetheless found that their conduct passed constitutional muster because it was the trial strategy of two experienced trial lawyers, and dismissed their statements as examples of counsel concluding in "hindsight" that they would have done something differently. The state court further found that habeas relief was

13

unwarranted because, even if Hall's trial counsel unreasonably failed to obtain and present certain mitigating evidence at sentencing, Hall failed to show that his counsel's performance ultimately affected the outcome of the guilt-innocence or sentencing phases of his trial. In short, the state court concluded that Hall had not proven that his conviction or sentence was constitutionally infirm.

Hall filed a motion for reconsideration, which was denied on August 30, 1993. On March 1, 1994, the Georgia Supreme Court denied Hall's application for a certificate of probable cause, and later denied his motion for reconsideration.

Having exhausted all avenues of recourse through the state system, Hall filed his federal habeas petition in the United States District Court for the Northern District of Georgia on April 23, 1997, (which he amended on August 15, 1997), alleging numerous constitutional infirmities underlying his conviction and death sentence. Before the district court, Hall also filed a motion for access to conduct another psychological evaluation and a motion for an evidentiary hearing, both of which were denied. On August 15, 2001, the district court granted the amended habeas petition in part and denied it in part, granting it only with respect to Hall's sentence of death based on his claim of ineffective assistance of counsel. The State then timely appealed the district court's grant of habeas relief as to the sentencing portion of Hall's trial. Hall in turn cross-appealed the district court's

denial of habeas relief as to the guilt-innocence phase of his trial, and he filed a motion for a certificate of appealability.  The district court granted Hall a certificate of appealability as to its denial of his ineffective assistance claim based on counsel's failure to vigorously pursue a voluntary manslaughter defense at trial and on appeal, and as to its denial of an evidentiary hearing and access to psychological testing.  The State's appeal and Hall's cross-appeal followed.

II.

Hall's petition for habeas corpus was filed on April 23, 1997, well after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), 28 U.S.C. § 2241, et. seq.[3]  Under 28 U.S.C. § 2254(d), an application for a writ of habeas corpus pursuant to the judgment of a state court shall not be granted by a federal court unless the decision is "contrary to" or is an "unreasonable application of" "clearly established" Supreme Court precedent.  See Williams v. Taylor, 529 U.S. 362, 391, 120 S. Ct. 1495, 1512, 146 L. Ed. 2d 389 (2000).  Moreover, a state court's factual findings are presumed correct, unless rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Putman v. Head, 268 F.3d 1223, 1241 (11th Cir.

_____

[3]The AEDPA plainly applies when a federal habeas petition is filed after April 24, 1996. See Lindh v. Murphy, 521 U.S. 320, 326-27, 117 S. Ct. 2059, 2063, 138 L. Ed. 2d 481 (1997).

15

2001), cert. denied, -- S. Ct. -- (No. 01-10914, October 7, 2002). The district court's determination of whether the state court decision was reasonable -- and thus, whether counsel's performance passed constitutional muster -- is subject to de novo review. See Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1321 (11th Cir. 2002), petition for cert. filed, No. 02-484 (Sept. 19, 2002). We review for clear error the district court's findings of fact underlying the claim. See Mincey v. Head, 206 F.3d 1106, 1142 (11th Cir. 2000), cert. denied, 532 U.S. 926, 121 S. Ct. 1369, 149 L. Ed. 2d 297 (2001). Finally, we review a district court's decision to deny an evidentiary hearing for an abuse of discretion. See Breedlove v. Moore, 279 F.3d 952, 959 (11th Cir. 2002).

Federal habeas relief for a state prisoner is available only upon a showing that the prisoner's confinement violates the United States Constitution or other federal law. Pursuant to 28 U.S.C. § 2254(d), as amended by the AEDPA,

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

16

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

As § 2254(d) makes clear, there are two distinct avenues for granting federal habeas relief. See Williams, 529 U.S. at 404, 120 S. Ct. at 1519. First, relief may be available if the state habeas court decision is "contrary to" clearly established United States Supreme Court precedent. For example, "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," the decision is contrary to Supreme Court precedent. Id. at 405, 120 S. Ct. at 1519. Alternatively, "if the state court confronts a set of facts that are materially indistinguishable from a [relevant Supreme Court decision and] arrives at a result different" from that decision, such a result is also contrary to Supreme Court precedent. Id. at 406, 120 S. Ct. at 1519-20.

Second, a petition for habeas relief may also be granted if the state court decision involved an "unreasonable application" of Supreme Court precedent. "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case" satisfies the "unreasonable application" clause of § 2254(d)(1). Id. at 407-08, 120 S. Ct. at 1520. The proper

17

inquiry is whether the state court applied federal law in an "objectively unreasonable" manner. Id. at 409, 120 S. Ct. at 1521.

Finally, § 2254(d)(1) provides a measuring stick for federal habeas courts reviewing state court decisions. That measuring stick is "clearly established Federal law." 28 U.S.C. § 2254(d)(1). "Clearly established federal law is not the case law of the lower federal courts, including this Court." Putman, 268 F.3d at 1241 (emphasis in original). Instead, in the habeas context, clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412, 120 S. Ct. at 1523.

The Supreme Court benchmark for ineffective assistance of counsel claims is found in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There, the Court established that implicit in the Sixth Amendment's guarantee of a criminal defendant's right "to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, is the right to the effective assistance of counsel. See Strickland, 466 U.S. at 686, 104 S. Ct. at 2063.

Hall argues that he was deprived of his right to the effective assistance of counsel at trial, sentencing, and on appeal, in violation of Strickland. In order to prove that the assistance rendered by his defense counsel was constitutionally

18

deficient, Hall must show that counsel's performance "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686, 104 S. Ct. at 2064. To this end, Hall must first show that counsel's performance was deficient. "This requires showing that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S. Ct. at 2064. If this substantial showing is made, Hall must then also establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687, 104 S. Ct. at 2064. For our purposes, significant to this two-pronged Strickland analysis is the additional observation that a court "may decline to reach the performance prong of the ineffective assistance test if convinced that the prejudice prong cannot be satisfied." Waters v. Thomas, 46 F.3d 1506, 1510 (11th Cir. 1995) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A.

Hall first challenges the district court's denial of habeas relief based on his claim that he received ineffective assistance during the guilt-innocence phase of his

19

trial. Although Hall raised many claims before the district court related to ineffective assistance of counsel at trial, the district court issued a certificate of appealability only as to the claims arising out of counsel's alleged ineffectiveness insofar as they failed to convince the trial court to instruct the jury on voluntary manslaughter. Thus, on appeal, Hall contends that counsel rendered ineffective assistance at trial because they failed to properly develop psychiatric and background evidence in support of a voluntary manslaughter defense, and then failed to present this defense adequately to the trial court.[4]

The state habeas court did not directly address all aspects of this claim, although Hall did expressly raise them in his amended state petition.[5] Instead, the

---

[4]Hall also mentions in passing that the trial court itself erred in failing to issue a voluntary manslaughter instruction. Yet, this issue, involving the trial court's purported error (as opposed to trial counsel's ineffective assistance of counsel), was deemed procedurally defaulted by the state habeas court and the district court, and we find no error in this determination. See O.C.G.A. § 9-14-48(d) (providing that under Georgia law, claims are barred when they are not raised at trial or on direct appeal, and do not rise to the level of plain error); Hill v. Jones, 81 F.3d 1015, 1022-23 (11th Cir. 1996) (explaining that under federal law, claims are procedurally defaulted when they are not raised at trial or on appeal, and the petitioner fails to demonstrate cause and prejudice or a fundamental miscarriage of justice to excuse the procedural bar).

[5]In his state petition, Hall claimed that "counsel failed to present necessary psychological evidence to support a 'heat of passion defense,' which would have entitled Petitioner to have the jury instructed to consider voluntary manslaughter as an alternative to malice murder." Hall further argued that "the outcome of the case might have been different had defense counsel developed and presented evidence that would have supported a voluntary manslaughter charge."

20

state court specifically rejected Hall's claim that counsel was ineffective for failing to pursue further psychological testing, holding that "[t]he failure to pursue additional psychological testing of [Hall] does not constitute ineffective assistance of counsel, because [Hall] had been deemed competent." The state court did not directly rule on the claim that counsel failed to investigate and present evidence in support of a voluntary manslaughter defense, but it did reject <u>all</u> of Hall's claims of ineffective assistance of counsel, finding that Hall failed to establish attorney error or prejudice under <u>Strickland</u>.

On federal habeas review, the district court also did not expressly address Hall's claims related to counsel's failure to pursue and present evidence in support of a voluntary manslaughter defense. Yet, it appears that the district court rejected this claim when it rejected in the aggregate all of Hall's claims related to ineffective assistance of counsel at the guilt-innocence phase of his trial, and held that "this strategy [of not preparing for trial or sentencing] had no adverse effect on the fundamental fairness of the guilt-innocence phase."

Although the state court's resolution of the issue was not comprehensively explicated, we have recently recognized that "the summary nature of a state court's decision does not lessen the deference that it is due." <u>Wright v. Sec'y for Dep't of Corr.</u>, 278 F.3d 1245, 1254 (11th Cir. 2002), <u>petition for cert. filed</u>, No. 01-10832

21

(June 12, 2002). Accordingly, we must determine whether the state habeas court's denial of Hall's ineffective assistance of counsel claim was "contrary to" or an "unreasonable application" of federal law. Because we agree with the state habeas court that the performance of Hall's counsel during the guilt-innocence phase of the trial was not deficient <u>and</u> that the outcome of Hall's trial was not prejudiced by counsel's failure to pursue the voluntary manslaughter defense, we necessarily conclude that the state court's denial of habeas relief did not involve an unreasonable application of federal law, and consequently that Hall's conviction was not constitutionally infirm.

First, we agree with the state habeas court's ultimate conclusion that Hall's trial counsel were not ineffective just because they failed to convince the trial court to give a voluntary manslaughter instruction. At the charge conference, Hall's counsel expressly asked the trial judge to include a voluntary manslaughter instruction in the jury instructions. Counsel contended that the jury should hear such a charge because "in this case the facts could have arose out of the heat of passion or arose out of what the victim did out on the ledge [of the apartment] that no one saw but that could have happened." The State responded that while there may have been evidence of passion or anger, there was no evidence of provocation in the record. The trial court agreed, observing that "[t]here is, to my knowledge,

no evidence that I can see in this case that would have been serious provocation. Because the law says very clearly that provocation by words alone will in no case ever justify excitement or passion. It has got to be more than words. There is absolutely nothing in this case that suggests that there was anything more than that." Hall's counsel responded that if Ms. Hall "did something to indicate that she did have a relationship [with Sebastian]" that might be enough to incite "provocation." The court again considered the issue, but concluded that "[t]he only thing I can find that would support that would be conjecture. And there is no evidence on the issue." The court thus denied Hall's request to include the charge of voluntary manslaughter in the jury instructions.

On this record, we cannot say that trial counsel's performance as to the voluntary manslaughter instruction was deficient. See Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000) (observing that "[c]ourts must 'indulge [the] strong presumption' that counsel's performance was reasonable" and that in light of this "strong presumption in favor of competence, the petitioner's burden of persuasion -- though the presumption is not insurmountable -- is a heavy one" ) (citations omitted), cert. denied, 531 U.S. 1204, 121 S. Ct. 1217, 149 L. Ed. 2d 129 (2001). Indeed, counsel raised the very issue and argued it before the trial court. That counsel did not reiterate the evidence in support of the defense -- i.e., that the

23

state medical examiner observed that the stab wounds could suggest "passion," that Ms. Hall was "scantily clad" at the time of the murder because she was wearing a slip, and that Hall witnessed a couple and a man named Sebastian leave the apartment where Ms. Hall was staying at 7:40 a.m., immediately before Hall approached the apartment -- is of no moment, since this evidence plainly had been presented to the trial court.[6] Moreover, as we discuss at length below, the fact that

---

[6]Furthermore, we are unpersuaded by Hall's argument that Hall's counsel failed to obtain a voluntary manslaughter instruction because counsel misquoted the law on voluntary manslaughter, and failed to correct the trial court. In <u>Strickland v. State</u>, 357 S.E.2d 85, 86-87 (Ga. 1987), the Georgia Supreme Court held that:

> In <u>Brooks</u>, the defendant's murder conviction was reversed because of the trial court's failure to charge the law of voluntary manslaughter. We noted that while words alone will not constitute sufficient provocation to reduce a crime from murder to manslaughter, the defendant in that case was not provoked merely by the victim's insulting words, but also by her adulterous conduct with which she taunted him prior to the shooting. We also noted that although the victim used words to make the defendant aware of her adultery, it was the victim's adulterous conduct, rather than her words describing that conduct, which served as sufficient provocation authorizing a charge on voluntary manslaughter. <u>See</u> O.C.G.A. § 16-5-2(a). . .

> Here, the victim's alleged adulterous conduct was not only relevant, but critical to the voluntary manslaughter claim.

<u>Id.</u> As this language makes clear, "words alone" do <u>not</u> constitute sufficient provocation -- the exact statement made by the trial court in Hall's case. Words, describing adulterous conduct, however, may be sufficient. Yet, Hall has presented <u>no</u> evidence that Ms. Hall told Hall anything of the sort before he attacked her. Quite simply, because there was no evidence to support this aspect of voluntary

24

Hall's counsel failed to gather and present any psychological evidence in support

of the voluntary manslaughter defense can hardly be described as ineffective

assistance since Hall still has failed to provide us with any psychological evidence

that could have been used in support of a voluntary manslaughter defense.

---

manslaughter, Hall's counsel was not ineffective for failing to "prove" to the trial court that the charge was appropriate. Additionally, there is no reasonable probability that even with an instruction, the jury would have convicted Hall of the lesser included offense.

We are also unpersuaded by Hall's argument that trial counsel rendered ineffective assistance by failing to properly object to the state court's refusal to give a voluntary manslaughter charge, and then by failing to enumerate this issue as an error on direct appeal. It is not clear that Hall actually raised this claim before the state habeas court or the district court; at most, it appears that Hall referred to it when he attempted to show the district court that counsel's failure to appeal the voluntary manslaughter instruction was the "cause" that should allow him to overcome the procedural bar to his claim that the trial court erred in refusing the instruction. Regardless of whether this issue is properly before this Court, see Walker v. Jones, 10 F.3d 1569, 1572 (11th Cir. 1994) ("[W]e have repeatedly held that 'an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.'") (citations omitted), we conclude that Hall's counsel was not constitutionally ineffective for failing to object or appeal the trial court's refusal to issue a voluntary manslaughter instruction for the same reasons that his counsel was not ineffective for having failed to convince the trial court to issue a voluntary manslaughter instruction in the first instance -- there is no deficient performance and there is no reasonable probability that the outcome would have been different had the instruction been provided or the appeal taken. See id. at 1573 (holding that trial counsel's "failure to object to [an] instruction" is prejudicial only if "a reasonable probability exists that 'but for' counsel's deficient performance, the result of the proceeding would have been different"); Heath v. Jones, 941 F.2d 1126, 1132 (11th Cir. 1991) (holding that appellate counsel's failure to raise a claim on appeal is prejudicial only if "the neglected claim would have a reasonable probability of success on appeal").

As for the second prong of <u>Strickland</u>, a petitioner must "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067.  As we recently explained in <u>Brownlee v. Haley</u>, -- F.3d -- (11th Cir. 2002),

> This requires a showing of more than "some conceivable effect on the outcome of the proceeding."  Instead, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."
>
> . . .
>
> Our confidence is undermined if the petitioner can "show that there is a reasonable probability that . . . the result of the proceeding would have been different" if counsel had not committed "unprofessional errors."  Significantly, although a petitioner must show that counsel's errors had more than "some conceivable effect on the outcome of the proceeding," the Supreme Court has said that a petitioner is not required to show that "counsel's deficient conduct more likely than not altered the outcome in the case." Rather, as the Supreme Court has held, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged."

<u>Id.</u> (internal citations omitted) (quoting <u>Williams</u>, 529 U.S. at 394, 120 S. Ct. at 1514; <u>Strickland</u>, 466 U.S. at 693-96, 104 S. Ct. at 2067-69).

Hall contends that there is a reasonable probability that if his counsel had convinced the trial court to issue a voluntary manslaughter instruction to the jury, the jury would have convicted him of voluntary manslaughter, instead of capital

26

murder. In particular, Hall says that his counsel failed to properly develop

evidence supportive of a voluntary manslaughter defense in the form of

background information about the tumultuous relationship between Hall and his

wife, or psychiatric evidence revealing the emotional distress that Hall suffered

from their relationship. After thorough review of counsel's conduct at trial and the

applicable Georgia law, we cannot find that the state court's denial of Hall's

ineffectiveness claim on grounds that counsel's performance at trial resulted in no

prejudice, was "contrary to" or an "unreasonable application" of federal law.

Section 16-5-2(a) of the Georgia Code provides the following definition of

voluntary manslaughter:

> [A] person commits the offense of voluntary manslaughter when he
> causes the death of another human being under circumstances which
> would otherwise be murder and if <u>he acts solely as the result of a
> sudden, violent, and irresistible passion resulting from serious
> provocation sufficient to excite such passion in a reasonable person</u>;
> however, if there should have been an interval between the
> provocation and the killing sufficient for the voice of reason and
> humanity to be heard, of which the jury in all cases shall be the judge,
> the killing shall be attributed to deliberate revenge and be punished as
> murder.

O.C.G.A. § 16-5-2(a) (emphasis added). The Georgia courts have applied this

language to hold that if there exists any evidence to create doubt, however slight,

as to whether the offense is murder or voluntary manslaughter, instructions as to

27

both of these offenses should be given.  See Thomas v. State, 170 S.E. 303, 304 (Ga. Ct. App. 1933); see also Gooch v. State, 379 S.E.2d 522, 524 n.2 (Ga. 1989) ("The better practice on the part of trial courts would be to charge voluntary manslaughter in all instances where requested by the defendant.") (emphasis in original).  At the same time, however, at least some evidence must support the charge of voluntary manslaughter before it is required.  See Swanson v. State, 453 S.E.2d 78, 80 (Ga. Ct. App. 1994).

Hall says that there is enough evidence to constitute "slight evidence" in support of a voluntary manslaughter instruction.  As an initial matter, we are not convinced that the proffered evidence -- including that presented at trial and that which could have been presented -- satisfies even the "slight evidence" required by Georgia law for a voluntary manslaughter instruction.  See Gooch, 379 S.E.2d at 524 (holding that where there was no evidence that the defendant acted as a result of a sudden, violent, and irresistible passion, the trial court did not err by refusing to charge the law of voluntary manslaughter).  But, even assuming that it does, we are even less persuaded that there is a "reasonable probability" that an instruction of voluntary manslaughter would have led the jury to convict Hall of voluntary manslaughter instead of first degree murder.

Indeed, in order to prove the voluntary manslaughter defense, a defendant must show that he was acting "as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person." O.C.G.A. § 16-5-2(a). In our opinion, the evidence that was actually introduced together with the evidence Hall contends should have been introduced -- that Hall had possible psychological problems as a result of his relationship with his wife, that he and his wife had attended marital counseling and had repeatedly broken up and reunited, that he saw a man leave the apartment where his wife was staying with another couple, and that his wife was in a slip early in the morning -- at most supports only the conclusion that Hall and his wife suffered long-standing, deep-seeded problems that had escalated. The evidence does <u>not</u>, however, even remotely suggest the conclusion that Hall acted out of a "sudden, violent, and irresistible passion resulting from serious provocation."[7]

---

[7]Moreover, although Hall contends that counsel could have obtained more evidence in support of a voluntary manslaughter instruction, Hall still fails to provide any evidence other than the psychiatric and emotional evidence that we do not find compelling. For example, at the charge conference, counsel suggested to the trial court that when Hall went to the apartment at 7:40 a.m., Ms. Hall maybe "did something to indicate that she did have a relationship [with Sebastian]" enough to "incite provocation." Hall, however, has not provided the Court with any evidence of such an occurrence. Similarly, at the habeas hearing, Hall's counsel testified that they "had been given a name but we weren't able to get a body, a person, who allegedly had been seeing his wife, and that was nagging at [Hall] prior to all of this." Yet, Hall has not provided the Court with any specific evidence in support of this

This conclusion is supported by powerful evidence undermining any voluntary manslaughter defense. First, the State introduced substantial evidence that Hall threatened the victim's life the day before the murder and, notably, carefully calibrated the risks associated with murder, observing that he would not get "more than ten years" in jail. Second, the State established that Hall had the presence of mind to take the knife from Ware's apartment the day before the murder. Third, the State presented undisputed evidence that Hall left Ware's apartment before 6:00 a.m., but waited until Sebastian, Hudson and Burns left at approximately 7:40 a.m., before breaking into the apartment and killing Ms. Hall. None of this evidence is consonant with a finding of a sudden, violent and irresistible passion. Nor was any evidence presented even remotely suggesting provocation, let alone serious provocation, sufficient to excite passion in a reasonable person.

In short, based on the evidence actually introduced at trial and on the evidence that could have been introduced, it seems to us highly unlikely that the jury would have convicted Hall of voluntary manslaughter instead of capital

---

statement. There is no evidence that Hall actually caught Ms. Hall, or even suspected Ms. Hall of, having an affair with anyone immediately prior to the murder. Nor is there any evidence that Ms. Hall even hinted to Hall immediately prior to the murder that she was having an affair.

murder even if it had been given a choice. In particular, our review of all the available evidence reveals no explicit evidence that Hall was suddenly provoked, either by any of Ms. Hall's actions or by any of her words, before he attacked and murdered her. Quite simply, had counsel gathered and introduced the available evidence and succeeded in obtaining a voluntary manslaughter defense, we do not believe that there is a "reasonable probability" that the jury would have convicted Hall of voluntary manslaughter. More importantly, the state habeas court's finding of no <u>Strickland</u> prejudice is neither "contrary to" nor an "unreasonable application" of federal law.

B.

Hall also says that even if we were to conclude that his counsel's performance does not entitle him to habeas relief from his conviction, we should remand the case for access to psychological testing and for an evidentiary hearing to develop the voluntary manslaughter claim. Again, we are unpersuaded.

Under the AEDPA, evidentiary hearings are permitted only in a sharply delineated number of circumstances. In particular, the statute provides that:

> If the applicant has <u>failed to develop</u> the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
>
> (A) the claim relies on--

31

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2) (emphasis added).

Recently, we explained the "failure to develop" language of § 2254(e)(2), holding that:

[T]he question of what exactly constitutes a "failure to develop" the factual basis for a claim in state court is one on which we have not spoken. The Supreme Court, however, has addressed this question in a recent opinion, and stated that a petitioner cannot be said to have "failed to develop" relevant facts if he diligently sought, but was denied, the opportunity to present evidence at each stage of his state proceedings. Williams v. Taylor, 529 U.S. 420, 437, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000) (Williams I). The Court noted that § 2254(e) requires habeas petitioners to be diligent in presenting the factual bases of their federal claims to state courts, and that a failure to do so will result in the denial of an evidentiary hearing in federal court (unless the statute's other stringent requirements are met). Id.

Breedlove v. Moore, 279 F.3d 952, 959-60 (11th Cir. 2002). Thus, § 2254(e)(2) applies where a petitioner has not diligently sought the opportunity to develop evidence in a state hearing.

In Hall's case, the district court found that the limitations embodied in § 2254(e)(2) apply because it was a lack of diligence on the part of Hall or his state habeas counsel that led to any "failure" to more fully develop Hall's claim. Hall contests this finding of the district court, arguing that his state habeas counsel in fact made diligent efforts to obtain all of the necessary evidence before the state habeas hearing, but that the state court unreasonably refused to continue the hearing and, therefore, his counsel was unable to develop crucial evidence.

"We have squarely held that a determination regarding a party's diligence is a finding of fact that 'will not be disturbed unless clearly erroneous.'" Drew v. Dep't of Corr., 297 F.3d 1278, 1283 (11th Cir. 2002) (quoting Walters v. City of Atlanta, 803 F.2d 1135, 1145 (11th Cir. 1986)). The record reveals that Hall's counsel had plenty of time and opportunity to prepare for the state habeas hearing. Hall filed his initial state habeas petition on February 7, 1992. The petition was continued three times until October 20, 1992, which gave Hall over eight months to prepare. Additionally, Hall's counsel did not move for access to a psychological evaluation until October 16, the Friday before the October 20 hearing, despite the fact that the court had told counsel on October 6, 1992, that no more continuances would be granted unless there was an actual conflict. Nonetheless, the state court granted this

last minute motion, and a preliminary psychological evaluation was conducted by Dr. Herendeen prior to the October 20 hearing.

Furthermore, the record reveals that the state habeas court afforded Hall ample opportunity to develop evidence at the October 20 hearing. In fact, even though it did not continue the hearing, the state habeas court did conduct a full-day evidentiary hearing on October 20. At that hearing, Dr. Herendeen gave extensive testimony speculating about the kinds of psychological problems that afflict Hall. In addition, Hall's trial counsel, Axam and Whatley, gave extensive testimony about their representation of Hall.

Because Hall's counsel had eight months to prepare and failed to ask the court for access for psychological testing until four days before the hearing, we are unable to conclude that the district court's finding that Hall and his habeas counsel lacked diligence is clearly erroneous. Accordingly, we agree that Hall "failed to develop" his claim in state court, and thus that his claim falls under the ambit of § 2254(e)(2). See Williams, 529 U.S. at 433, 120 S. Ct. at 1488.

The district court further found that Hall failed to meet any of the requirements of § 2254(e)(2). Once again, we agree. When we apply § 2254(e)(2)(A)(i), Hall's claim, relying on the long-established Strickland test, fails to meet the requirement that his "claim relies on a new rule of constitutional law." Applying §

34

2254(e)(2)(A)(ii), we further find that because Hall's ineffective assistance of counsel claim is based on evidence that existed at the time of the state hearing, and that any lack of evidence stems directly from Hall's failure to diligently develop it, Hall's claim does not involve "a factual predicate that could not have been previously discovered through the exercise of due diligence." Finally, and perhaps most important, Hall has also failed to meet the requirements of § 2254(e)(2)(B) because he has not shown that any "facts underlying the claim would be sufficient to establish that but for constitutional error, no reasonable factfinder would have [convicted Hall of capital murder]." Therefore, we can discern no basis on which to conclude that the district court abused its discretion in denying Hall an evidentiary hearing under § 2254(e)(2).[8]

### III.

Finally, we turn to the central issue on appeal: Hall's challenge to the constitutionality of the assistance of counsel he received during the sentencing phase of his trial. Specifically, he contends that the district court properly found that his trial counsel provided ineffective assistance of counsel during the sentencing phase of his

---

[8]Moreover, as for Hall's claim that the district court erred in failing to grant access for psychological testing, we can find no abuse of discretion in the district court's denial of Hall's request. Hall has failed to show precisely how additional psychological evidence would support his claim that counsel rendered ineffective assistance by failing to pursue a voluntary manslaughter defense at trial.

trial by failing to obtain expert psychological assistance, failing to present non-expert mitigation evidence, and failing to adequately prepare Hall to testify. Hall further says that these failures resulted solely from counsel's gross misallocation of time, because counsel focused almost exclusively on convincing Hall to plead guilty and conducted little, if any, sentencing investigation and preparation.

Again, we must determine whether the state habeas court's denial of Hall's claim of ineffective assistance at sentencing was "contrary to" or an "unreasonable application" of federal law. Even if we assume arguendo that the state court's ruling as to the performance prong of Strickland was "contrary to" or an "unreasonable application" of federal law, we nonetheless conclude that the state court properly found that Hall's sentence was not prejudiced by counsel's purportedly deficient performance. Accordingly, we are constrained to conclude that the state court's denial of habeas corpus relief was reasonable, and, upon de novo review of the district court's determination to the contrary, see Van Poyck, 290 F.3d at 1321, we reverse the district court's grant of such relief.

The state habeas court rejected Hall's ineffective assistance claim. In so doing, the court acknowledged the testimony of Hall's counsel at the state hearing, where they admitted to deficiencies in their conduct before and during the sentencing phase of Hall's trial, but found that their testimony was not compelling evidence of deficient

performance. The court further observed that despite Axam's testimony that he did not obtain military or counseling records that would have been essential to the case, Axam had unsuccessfully attempted to contact military personnel to serve as witnesses, and did present evidence in mitigation by presenting members of Hall's family to testify about his background. On this record, the state habeas court concluded that Hall failed to show that his counsel's investigation and presentation of evidence at sentencing was deficient.

On federal habeas review, however, the district court reached a different conclusion, finding that counsel's performance at sentencing was deficient under Strickland. In reaching this conclusion, the district court discussed in detail the acknowledgments by Hall's counsel that they had no excuse for their failure to gather and present mitigating psychological or background evidence at sentencing. The district court thus found a total lack of reasoned trial strategy and a virtual lack of trial preparation, and determined that no competent counsel would have proceeded with sentencing as Hall's counsel did. The district court ultimately deemed the state court's determination to the contrary to be an unreasonable application of Strickland.

After careful review, although there is evidence in the record to support the district court's finding of deficient performance, we need not and do not "reach the performance prong of the ineffective assistance test [because we are] convinced that

37

the prejudice prong cannot be satisfied." Waters, 46 F.3d at 1510 (citation omitted). Indeed, in order for Hall to obtain habeas relief under Strickland, he must establish not only that counsel's performance was deficient, but also that counsel's errors "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693, 104 S. Ct. at 2067.

The state habeas court, after finding that Hall failed to establish deficient performance, expressly determined that Hall also failed to meet the Strickland prejudice prong. In so holding, the state court briefly analyzed prejudice in several places throughout the opinion, and then concluded by saying that "Petitioner has failed to establish attorney error and prejudice under Strickland v. Washington." We cannot say that this conclusion is "contrary to" or amounts to an "unreasonable application" of federal law.

The district court disagreed with the state habeas court, however, concluding that Hall had met his burden of proving Strickland prejudice. In so holding, the district court observed that because the state habeas court at one point said that it "c[ould] not conclude as a matter of law that [the presentation of Hall's military or counseling records as mitigating evidence] would have resulted in a different outcome at the sentencing phase of trial," it had applied incorrect federal law. In particular, the district court observed that the Strickland prejudice prong requires only a "reasonable

probability" of a different outcome, and the state court's application of a more rigorous standard -- that is, that Hall failed to show that had counsel's performance not been deficient the result would have been different -- was "contrary to" established law, and thus that the state habeas court's determination on this issue should receive no deference from the district court. See Romine v. Head, 253 F.3d 1349, 1365 (11th Cir. 2001) ("[W]hen there is grave doubt about whether the state court applied the correct rule of governing federal law, § 2254(d)(1) does not apply. That is what we have here, so we proceed to decide the issue de novo.") (citations omitted), cert. denied, 122 S. Ct. 1593, 152 L. Ed. 2d 504 (2002). The district court then conducted its own Strickland prejudice analysis, and held that there was a "reasonable probability" that but for Hall's counsel's deficient performance the sentence "might have been different," and thus that the state habeas court's rejection of Hall's ineffective assistance of counsel claim involved an unreasonable application of the prejudice prong of Strickland. We disagree.

We begin our discussion of Hall's prejudice claim by examining the district court's determination that the state habeas court applied a standard "contrary to" clearly established federal law in its prejudice discussion. We recognize that in the middle of its opinion, the state court found that Hall failed to show Strickland prejudice, observing that "this Court cannot conclude as a matter of law that such

39

evidence, if . . . presented, would have resulted in a different outcome at the sentencing phase of trial." While these remarks may be read to suggest that the state court required more certainty of a different outcome than <u>Strickland</u> requires, it nevertheless appears to us that the state court was simply using abbreviated language in making its findings, especially since the state court opinion made abundantly clear that it applied exactly the right federal law.

Indeed, the state court properly quoted at the outset of its opinion the precise standard embodied in <u>Strickland</u>, explicitly requiring Hall to show that there is "<u>a reasonable probability</u> that, but for counsel's unprofessional errors, the result of the proceeding would have been different," 466 U.S. at 694, 104 S. Ct. at 2068 (emphasis added). Additionally, it concluded at the end of the opinion that "Petitioner has failed to establish attorney error and prejudice under <u>Strickland v. Washington</u>." We must defer to the state court ruling unless we can say that it was "contrary to" or an "unreasonable application" of clearly established federal law. <u>Williams</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520. In light of these express references to <u>Strickland</u>, and reading the opinion as a whole, we do not believe that the state court applied a standard "contrary to" clearly established federal law.

The state habeas court essentially held that Hall failed to show that counsel's performance, including their failure to gather and present psychological and

40

background evidence about Hall, resulted in Strickland prejudice.[9]  In deciding whether this ruling by the state court ultimately was reasonable, we conduct the prejudice inquiry by "'evaluat[ing] the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced in the habeas proceeding -- [and] reweighing it against the evidence in aggravation.'" Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001), cert. denied, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 397-98, 120 S. Ct. at 1515). Quite simply, we do not believe that it was unreasonable for the state habeas court to conclude that after weighing the available mitigating evidence against the aggravated circumstances of the crime, there is no reasonable probability that the outcome of Hall's trial would have been different if the jury had heard all of the available mitigating evidence.

As a matter of fact, the aggravating evidence surrounding the murder of Ms. Hall was graphic and compelling, and was introduced in detail before the jury.  First, the jury saw vivid photographs of Ms. Hall's wounds.  As the photographs were introduced into evidence, the state medical examiner described each of the multiple

---

[9]Hall further contends that his counsel's failure to prepare him to testify amounted to Strickland prejudice.  The state habeas court, however, expressly found that this allegation "lack[ed] factual support."  Because a state court's factual findings are presumed correct, unless rebutted by clear and convincing evidence, see 28 U.S.C. § 2254(e)(1), and because Hall has provided no evidence to rebut this finding, we cannot say that counsel's failure to prepare him to testify prejudiced Hall's trial in this case.

stab wounds on Ms. Hall's neck, torso and extremities, including one that was eight inches deep and went completely through her liver and down into the back of her abdomen.  He summarized that "[i]f you count the ones on her hands [and her arms which were deep], there were seventeen.  That is not counting the crisscrossing cuts on her neck."  He continued, "of those seventeen, at least seven or eight were potentially fatal injuries."  He further observed that "the great majority of her stab wounds are consistent with her being on the ground when she was stabbed."  He also testified that the wounds suggest that "even though the person may be in a rage, . . . the person had some control over the placement of some of these injuries."  Finally, he noted that Ms. Hall was aware of the injuries she sustained and that it took her some five minutes to die.

Second, the jury heard a frantic tape recording of Ms. Hall's last sounds leading up to her death, through the distressing 911 phone call that Ms. Hall made to report that an intruder was attempting to break into the apartment.  The tape reveals that during the call, there was the sound of breaking glass, followed by Ms. Hall's repeated pleas for her life, "Bo, stop it please, Bo stop it."  The recording ends with Ms. Hall's final words, "Stop Bo please.  Oh God . . . Oh."

Third, the jury heard a partial description of the murder from apartment complex resident Pamela Rathbone.  Rathbone testified that she saw a "fairly slender

42

black girl," wearing a slip, run out of an apartment chased by a man, and heard the girl saying "something to the effect" of "don't, stop." Rathbone explained that when she came closer to the apartment, she saw that the apartment door was open, the girl was "lying on the floor, and [the man] was standing over her with his fist raised."

Fourth, the jury heard evidence that Hall had contemplated the murder beforehand. They heard from three different witnesses, Ware, Marshall, and Gardner, that the night before the murder, Hall was angry that Ms. Hall had moved out and had repeatedly threatened to kill her. All three witnesses also testified that Hall reflected on and carefully calibrated what would happen to him if he killed his wife -- two of the witnesses, Ware and Marshall, testified that Hall said he would not get "more than ten years" in jail, and Gardner recalled Hall saying that "he would get about ten or twenty years." In addition, the jury learned that Hall had previously threatened to kill his wife. Ms. Hall's sister testified that when she had visited the couple at Fort Dix, she had once seen Hall grab Ms. Hall by the hair and pull her into a room, making noises for almost an hour that indicated that he was banging her head against the wall. Ms. Hall's sister further testified that during that visit, Hall told her that "he was going to end up killing [Ms. Hall] one of these days."

The jury also learned that the knife used to kill Ms. Hall was taken from Ware's apartment, where Hall had been staying, at least one day before the murder. Ware

43

testified that on Sunday, the day before the murder, she was cooking dinner and "was looking for the knife" but could not find it. She said that she "never thought nothing else about the knife" until her neighbor, Gardner, said to her after Ms. Hall's death that she knew where the knife was.

Finally, the jury was told that Hall had been watching the apartment in the days leading up to the murder. He was seen lurking around Hudson's apartment where Ms. Hall was staying a day before the crime, and indeed, on the morning of the murder, Hall had left his apartment by the time Ware and Marshall woke up at 6:00 a.m., but did not approach Ms. Hall in Hudson's apartment until after everyone staying there had left at 7:40 a.m..

As these details make abundantly clear, there was extensive and brutally graphic aggravating evidence presented to the jury. In fact, the jury deemed the evidence sufficient to find a statutory aggravating circumstance -- that the murder was "outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," O.C.G.A. § 17-10-30(b)(7) -- and to recommend imposition of the death penalty.

In performing the Strickland prejudice analysis, the impact of the aggravating evidence on the jury's decision must be weighed against the "the totality of the available mitigation evidence -- both that adduced at trial, and the evidence adduced

44

in the habeas proceeding." Fugate, 261 F.3d at 1217 (citations and internal quotations omitted). Thus, we determine whether, upon weighing the aggravating evidence against both the mitigating evidence that was presented at trial and the mitigating evidence that Hall now proffers, the state court's finding of no prejudice was reasonable.

The jury did actually hear some evidence in mitigation at sentencing. In particular, they heard from Hall's mother that he was not a problem child, and did not have problems in high school. She said that growing up, Hall would keep to himself and would not fight anyone. She also said that when Hall and his wife were living with her, she did not notice any marital trouble. Similarly, Hall's sister testified that he was never a violent person, and did not smoke, drink or do drugs. She also said that when the couple stayed with her, they did not appear to have any problems, and that Hall loved his wife very much.

Hall himself also testified at sentencing. He said that he had received a bachelor's degree in science, and that he had never been convicted of a crime. He also told the jury that after serving a four-year term in the Army, he had been commissioned back, achieving the rank of second lieutenant and then first lieutenant, and was eligible for a promotion to captain when he resigned. He further explained to the jury that his marital problems were long-standing and escalated over time, that

45

ultimately he was forced to leave the Army because of his wife's influence, and that he never completely adjusted back into civilian life, jumping from one minimum wage job to another.

Before the habeas courts, Hall provided two additional sets of mitigating information that were not introduced at trial: (1) observations by two psychologists about Hall's mental state; and (2) background accounts of Hall's character, primarily involving his military career.[10] We acknowledge that both pools of evidence may be mitigating, but we also recognize that the psychological observations remain extremely speculative, and that the military record and other background information were in fact introduced to the jury to some degree.

First, the psychological testimony, while possibly illuminating, still has not been presented to the courts with anything even remotely approximating probabilities, let alone a concrete expert opinion. Dr. Herendeen, the psychologist who examined Hall for two hours prior to the state habeas hearing, made numerous observations about Hall's psychological state at the hearing, and all of his observations were

---

[10]Hall also asserts that marital counseling records from his time in the military would have served as mitigating evidence to explain the problems he had with his wife. While those records may have been mitigating, they still have not been obtained from the military or presented to the courts, and we therefore cannot use them to calibrate how the outcome of the trial might have been different, if at all, had they been introduced.

46

couched in the most tentative of terms. When discussing the disorders that may afflict Hall, Dr. Herendeen testified only that: (1) he "came up with a diagnosis of paranoia" but emphasized that he "d[id not] know at what level of paranoia we are talking about here" (emphasis added); (2) "there is a question of borderline personality structure" (emphasis added); (3) he found "strong evidence suggesting that there was [a violent attachment situation (which refers to a hostile dependent relationship in which the person has a strong emotional bond with someone and at the same time often harbors intense rage)]" (emphasis added); and (4) he was "trying to look at the possibility of a post traumatic stress disorder" (emphasis added).

When describing how Hall was functioning at the time of the crime, Dr. Herendeen again emphasized how much was unknown about Hall, saying that: (1) "[j]ust the discrepancy in his abilities and his achievements makes me wonder what was going on there [a]nd then when we combine the horrible circumstances of his . . . long history of marital problems, I can only speculate at this point, but I must assume that his mental state was very disturbed then and continues to be a problem now" (emphasis added); (2) "[h]is actual personality structure, I really don't know" (emphasis added); (3) "we really don't know what was going on at that time . . . We really do not know his psychological makeup at the time of the incident" (emphasis

47

added); and (4) "it is obvious he was not in his normal mental state . . . I just don't know the degree of severity of that mental state at this time" (emphasis added).

Dr. Herendeen further observed that Hall did not seem to undergo any "psychotic episodes" ("Based upon the data which you reviewed and your observations of Mr. Hall, have you observed any incident that you would characterize as a psychotic episode?" "No, I have not."), or to suffer from "intermittent explosive disorder" ("I know that we know from people who have been victims is that they often act out, in later life situations, the consequences of their trauma. Diagnostically, what I am trying to look at is, is there an intermittent explosive disorder. When I talk to him, he doesn't seem to appear that way.").

Notably, when Dr. Herendeen was asked directly whether he had been able to form even a tentative or preliminary opinion "with regard to his mental state at the time of the death of Mrs. Hall," he answered, "[n]o." The state habeas court later reemphasized this point, summarizing that "[w]hat you are asking the doctor to do today is to basically say that I haven't had enough time to render an opinion in this case, but I have done sufficient evaluation to know that I ought to do more. Is that basically all it is?" Hall's habeas counsel answered, "[y]es, Your Honor, it is."

From Dr. Herendeen's testimony, taken in the best light for Hall, we learn only that there is the possibility that Hall was psychologically compromised or "in an

48

altered mental state" at the time of the crime, and that he may suffer from a personality disorder, paranoia, paranoid delusions, post-traumatic stress disorder or a violent attachment disorder. Yet, Dr. Herendeen was unable to speak about these diagnoses with any confidence, let alone say that any such diagnoses drove Hall to kill his wife. As a result, his testimony does not provide us with any medically reliable insight into the psychology of Hall.

Dr. Toomer, a psychologist who filed an affidavit before the district court with observations about Hall, likewise made statements riddled with uncertainty. He was only able to say that "based upon the data gathered thus far, . . . a strong possibility exists that a psychological evaluation would reveal the existence of numerous mental health mitigators and severe psychological dysfunction characterized by symptomatology indicative of disturbance ranging from severe personality disorder to major mental illness with vacillating behavior along the psychopathological continuum" (emphasis added). Dr. Toomer's observations also never became more certain because he never met with Hall, and so was required to make his observations based on paper documentation and interviews with Hall's family members.

In short, virtually all of the psychological observations about Hall's mental state are plagued with speculation and conjecture, making it altogether unclear which diagnosis, if any, pertains to Hall and deviates from the population at large. We

simply cannot assume on this tentative and speculative record that the psychologists'

statements, as they stand now, would have survived the State's scrutiny at sentencing,

let alone convinced a jury that Hall was psychologically compromised at the time of

the crime.[11]  Nor can we simply assume that if Hall had undergone further

examination, the "possible" diagnoses alluded to by the psychologists would have, in

fact, been made.  "Speculation is insufficient to carry the burden of a habeas corpus

petitioner as to what evidence could have been revealed by further investigation."

Brownlee, -- F.3d at -- (quoting Aldrich v. Wainwright, 777 F.2d 630, 636 (11th Cir.

1985)).  We cannot say, therefore, that the state court unreasonably discounted the

impact that these observations of the psychologists would have had on the jury.

Hall has also provided us with his military records as other evidence to consider

in mitigation.  As we have noted, Hall's evaluations were outstanding concerning

Hall's attitude ("His attitude is a model for his peers and will insure his rapid

promotion"; "Hall was unselfishly giv[ing of] his time and talents for the betterment

of the section and the accomplishment of the mission"; "He voluntarily remains after

_____

[11]We recognize that the prosecutor told the jury that there was no evidence of any psychological problems, because "[i]f he was crazy, you would know more about that if he was.  He isn't."  Even though the jury was told there was no such evidence, we continue to believe that these preliminary observations about Hall's psychological state are so tentative and unsure that they cannot be characterized as persuasive evidence of any psychological problems, even if the jury had heard them.

duty hours to insure all needed administrative tasks have been accomplished"; "He willingly accepts constructive criticism and never makes the same mistake twice"); his abilities ("His ability to work under difficult and challenging situations and handle confidential material has been his main asset to this Command"; "He is currently doing the work once accomplished by two experienced civilian clerks . . . Never complaining, [Hall] applied himself to the task at hand and was thus able to add a stabilizing influence"; "Hall has the ability to work successfully with others in an outstanding manner"); and his contributions to the Army ("Hall is a credit to this unit, USASETAF and the United States Army"; "I would be proud to serve with Specialist Hall in any capacity"). The records also include a letter of appreciation for Hall from a Command Sergeant Major of the U.S. Army, who stated: "It is perhaps presumptuous of me as the Command Sergeant Major to write a letter of this nature to you . . . but your performance of duty has made my job so much easier that I must make note of that fact. You are to be commended, for no one else could have done it so well." We acknowledge that these commendations are relevant, and that they would have provided the jury with additional mitigating evidence in Hall's favor.

Nonetheless, we must also acknowledge that the jury did hear about Hall's military career. In particular, they heard Hall testify at sentencing that after high school, he "went to the Army four years on the enlistment." The jury then learned that

after this four-year term, he went to college, and after finishing college, he was "commissioned back into the Army as a second lieutenant." Hall also testified that he achieved the rank of first lieutenant, and before leaving the Army, he again was being considered for a promotion, this time to the rank of captain. Hall explained that these promotions, from second lieutenant to first lieutenant or first lieutenant to captain, "automatically come[] up" every year-and-a-half, when a board of the Department of Army considers whether or not an officer is qualified to be promoted. Hall further explained that he left the Army before achieving the rank of captain in part because his wife, Ms. Hall, had complained to his superior that he was not attending counseling or paying the bills at home. Thus, the jury knew that Hall was performing well in the military, indeed, well enough to be promoted twice. They also knew that Hall had gone to college. Additionally, they knew that Hall had never been arrested nor convicted of any crime anywhere in the world. Based on what the jury did hear, we, again, do not think that the state court unreasonably discounted the impact that these military records would have had on Hall's sentence.

Having chronicled all of the mitigating and aggravating evidence in this case, the ultimate question is whether, upon weighing "the totality of the available mitigation evidence . . . against the evidence in aggravation," Fugate, 261 F.3d at 1217 (citations omitted), the state court's decision was an unreasonable one. We cannot say

that it was. As we have extensively discussed, the aggravating evidence of a savage and premeditated murder is powerful. Moreover, at trial, the jury did hear that Hall was an upstanding citizen who had performed well in the military and at school, but who had constant marital problems with his wife, left the Army because of her, and never completely adjusted back into civilian life. Therefore, while the mitigating evidence discovered after the trial may further establish that Hall was a good soldier, and that psychological problems possibly might explain his marital difficulties, the psychological evidence is altogether uncertain and speculative and at least some of Hall's military record was already introduced at his trial.

Quite simply, because the aggravating evidence is strong and the mitigating evidence is plainly weakened by uncertainty and some redundancy, we cannot say that the state court's calculus as to prejudice was an unreasonable one. See Putnam, 268 F.3d at 1248 ("'It is not enough for the [petitioner] to show the errors had some conceivable effect on the outcome of the proceeding . . .,' because '[v]irtually every act or omission of counsel would meet that test.' . . . Rather, where, as here, a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'") (citations omitted). As a result, we are constrained to conclude that the state court

reasonably held that there is no <u>reasonable probability</u> that the jury's determination at sentencing would have changed if it was presented with the additional evidence.

We have one final observation. We have said that the state court applied the proper <u>Strickland</u> prejudice standard in finding that Hall failed to meet the test, and we in turn have afforded considerable deference to the state court decision, as mandated in <u>Williams</u>, 529 U.S. at 407-08, 120 S. Ct. at 1520-21. But even if we were to conclude that the state court had made a legal error -- by requiring Hall to prove prejudice with more certainty than <u>Strickland</u> requires and thus using language that is "contrary to" federal law -- we still cannot say, based upon our own <u>de novo</u> review of the state court decision, <u>see</u> <u>Romine</u>, 253 F.3d at 1365, that there is a reasonable probability that if the jury had heard all of the available evidence, the outcome of Hall's trial would have been different. Indeed, in our view, the aggravating evidence of Hall's crime, conveying his cold, calculating premeditation and the brutality of the murder, far outweighs the mitigating evidence of Hall's character and background, even when accompanied by the additional evidence comprised of speculative psychological observations and somewhat redundant military praise. On this record, the very most we can say is that there is a <u>possibility</u> that with all of this evidence, the jury would have reached a different result. But we

cannot say that there is a reasonable probability that had the jury considered all of the evidence, it would have sentenced Hall to life rather than death.

In short, we conclude that Hall's petition for writ of habeas corpus relief must be denied, that the state habeas court properly denied relief, and that the district court's decision granting such relief must be reversed.[12]

---

[12]As an aside, we note that Hall is not entitled to an evidentiary hearing on the ineffective assistance of counsel at sentencing. We first observe that Hall has not requested this Court to remand for an evidentiary hearing on the sentencing issues, should we reverse the district court's grant of relief. More importantly, however, the AEDPA, which strictly limits a federal habeas petitioner's ability to receive an evidentiary hearing, bars Hall from receiving a hearing in this instance. Under the AEDPA, the district court shall not hold an evidentiary hearing on a claim if a petitioner has "failed to develop the factual basis of a claim in State court proceedings," unless the petitioner shows that "(A) the claim relies on -- (i) a new rule of constitutional law . . ., or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). Here, because the district court found that it was a lack of diligence on the part of Hall and his state habeas counsel that led to any "failure" to more fully develop the factual basis of his claim in the state habeas court, and we do not disagree with this finding, § 2254(e)(2) applies. See Williams, 529 U.S. at 432, 120 S. Ct. at 1488. Yet, Hall fails to meet both requirements of the section: (1) Hall's claim does not rely on a new rule of constitutional law, or a factual predicate that could not have been previously discovered through the exercise of due diligence; and (2) although it is true that more facts pertaining to Hall's claim may have been developed (such as possibly more definite psychological evidence), we cannot say that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have sentenced Hall to death. Therefore, Hall is not entitled to a hearing under § 2254(e)(2).

## IV.

Accordingly, we AFFIRM the district court's denial of Hall's petition for a writ of habeas corpus as to his conviction, AFFIRM the district court's denial of Hall's motions for an evidentiary hearing and for access to psychological testing, REVERSE the ruling of the district court granting Hall's petition as to his sentence of death, and REMAND this case with the instruction that the district court reinstate Hall's original sentence.

AFFIRMED, in part, REVERSED, in part, and REMANDED with instructions.